El Pueblo de Puerto Rico, demandante y apelado, *v.* Celestino Torres Rivera, acusado y apelante.

No. 5499.—*Sometido:* Febrero 1, 1935. *Resuelto:* Febrero 8, 1935.

*Burset & Pérez Pimentel,* abogados del apelante; *R. A. Gómez, Fiscal,* y *Luis Janer, Fiscal Auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

Se acusa a Celestino Torres Rivera de un delito de homicidio voluntario cometido en ocasión de una súbita pendencia o arrebato de cólera. Se alega que la acusación es vaga e indefinida y que tiende a confundir al acusado, porque no expresa de un modo claro los actos constitutivos del delito, porque se imputa en la misma más de un delito, y el acusado no está informado de cuál de ellos ha de defenderse.

Aparece de los autos que la lectura de la acusación se llevó a cabo en 15 de mayo de 1933 y que el juicio tuvo lugar en 13 de septiembre del mismo año. El acusado no hizo objeción alguna a la acusación cuando le fué leída, limi-

tándose a alegar su inocencia y a solicitar juicio por jurado. Y si bien es cierto que compareció sin abogado, la corte, varias semanas antes del juicio, nombró para defenderlo al abogado José Pérez Pimentel.

No se interpuso objeción alguna a la acusación hasta el día de la vista, después de haber anunciado las partes estar listas para juicio y cuando iban a sortearse los jurados. La defensa presentó entonces una excepción perentoria a la acusación. La corte manifestó que ya se había interpuesto la alegación de inocencia y la defensa anunció que se trataba de una excepción privilegiada. No lo entendió así la corte al enterarse de su contenido. Manifestó entonces el abogado que se proponía alegar que los hechos alegados no constituían delito público. Finalmente la corte declaró sin lugar la moción, aparentemente por haber sido presentada en el acto del juicio, algunos meses después de leída la acusación.

No siendo privilegiada la excepción ofrecida por el acusado, no puede decirse que la corte inferior cometiera el error que se le atribuye. La defensa se basó en que la acusación imputa la comisión del delito en forma disyuntiva, a saber: en ocasión de una súbita pendencia o un arrebato de cólera. Creemos, como la corte inferior, que esta excepción fué presentada demasiado tarde.

En el caso de *State* v. *Mahoney*, 24 Mont. 284, 61 Pac. 647, resuelto por la Corte Suprema de Montana, se sostuvo que cualquier objeción a la inclusión en un cargo (*count*) de las diferentes formas en que se haya cometido un delito, debe ser presentada en la corte de distrito antes de contestarse la acusación. Si la cuestión no fué levantada en la corte sentenciadora no debe ser considerada en apelación. El artículo 77 de nuestro Código Penal es idéntico al artículo 9151 de los códigos revisados de Montana. Este artículo dice así:

"La acusación habrá de comprender sólo un delito, pero el mismo delito puede ser expuesto en diferentes formas y bajo distintos cargos, y cuando el delito haya sido cometido usando de medios di-

versos, los medios pueden ser alegados alternativamente en el mismo cargo.

Esta corte, en el caso de *El Pueblo* v. *Alomar,* 10 D.P.R. 297, expresa un criterio muy parecido al sostenido por la Corte Suprema de Montana. Dispone el artículo 152 del Código de Enjuiciamiento Criminal que tanto la excepción perentoria como la confesión o negación, deberá hacerse en sala de justicia, bien al leerse el acta de acusación o en cualquier otro tiempo que para ello le fuere concedido al acusado.

En el caso de *Smith* v. *State,* 191 N. W. 689, resuelto por la Corte Suprema de Nebraska, se alegó como motivo de error el hecho de que la acusación hubiese sido redactada en la disyuntiva. Resolviendo la cuestión planteada la corte dijo:

"En este caso no aparece que el acusado haya sido perseguido por más de un delito, y cuando el uso de la disyuntiva se traduce en una acusación de crímenes distintos y separados, la objeción de que la alegación se hizo en la disyuntiva no puede ser alegada con éxito en apelación."

No estuvo desacertada la corte inferior al desestimar por tardía la excepción de la defensa, pero aun cuando esta excepción hubiese sido oportunamente presentada, no procedería la revocación de la sentencia, porque la acusación si bien defectuosa (*Pueblo* v. *Rodríguez,* 43 D.P.R. 134), así como la prueba, demuestran que en este caso concreto no ha habido perjuicio sustancial para los derechos del acusado. No se imputa en la acusación más de un delito. La transacción que culminó en la muerte de Antonio Mercado es una. Tanto la teoría de la defensa como la de la acusación demuestran que entre Celestino Torres Rivera y Antonio Mercado se cambiaron algunas palabras, que hubo una agresión y que en el calor de la lucha el acusado privó de la vida a su contendiente. En realidad, ambas modalidades intervinieron en la comisión del delito; la súbita pendencia y el arrebato de cólera. Basta leer la prueba practicada para llegar a la conclusión de que Celestino Torres actuó bajo la excitación pro-

ducida por la lucha sostenida con el interfecto. No ha habido perjuicio sustancial para los derechos del acusado. Cualquiera de las dos modalidades alegadas hubiese sido bastante para hacer frente a la prueba. El acusado no puede decir que ha sido inducido a error por los términos en que está redactada la acusación. Los hechos demuestran que estuvo informado acerca de la forma en que se cometió el delito imputado.

En el caso de *Smith* v. *State,* supra, la Corte dijo:

"La información ha sido vigorosamente atacada porque las alegaciones están en la disyuntiva. En este particular ha seguido el lenguaje de la ley *verbatim*. Esta corte ha aprobado frecuentemente la práctica de redactar la información usando las palabras del estatuto, y en este caso no ha habido sorpresa ni desventaja para el acusado y no puede resultar ningún perjuicio para la justicia."

Como segundo motivo de error se alega que la corte ordenó al secretario que tomase juramento definitivo a parte del jurado, sin estar el jurado completo. Examinados los primeros doce jurados y habiendo manifestado las partes que no tenían recusaciones motivadas, se procedió a las perentorias. La defensa excepcionó perentoriamente a dos jurados, manifestando que no tenía más excepciones perentorias por ahora. El fiscal no estableció recusación alguna. El secretario procedió a tomar juramento definitivo a los diez miembros del jurado, con la oposición de la defensa por no estar el jurado completo. La corte hizo constar que se tomaba el juramento después de haber confesado ambas partes que habían terminado las recusaciones de estos caballeros. Sorteáronse entonces dos jurados más, que fueron examinados. El fiscal no formuló recusación perentoria. La defensa recusó a uno. Se tomó al otro juramento definitivo. El acusado reiteró su objeción. Se sorteó un nuevo jurado, que fué examinado por ambas partes y recusado por el fiscal. Hubo otra recusación perentoria por parte de la defensa y finalmente el jurado quedó constituído con otro nuevo miembro

que fué aceptado por ambas partes. En estos momentos la defensa recusó al jurado Luis Muñoz Jr., que fué uno de los diez miembros del jurado que habían tomado juramento por orden de la corte después de examinados y de haberse invitado a las partes a hacer uso de sus recusaciones perentorias. La defensa en esa ocasión recusó a dos jurados, quedando el Sr. Muñoz Jr., entre los diez que tomaron juramento para entender en la causa.

Negó la corte la recusación perentoria del jurado Muñoz, haciendo constar que las recusaciones deben ser hechas antes del juramento definitivo y de completarse el jurado, de acuerdo con el artículo 221 del Código de Enjuiciamiento Criminal y con la regla que dicha corte dictara el día en que comenzó el término por jurado, o sea el 5 de septiembre. La defensa tomó excepción a la resolución del tribunal.

Ambas partes, el fiscal y la defensa, están de acuerdo en que la corte cometió error al denegar la recusación perentoria del Sr. Muñoz Jr. No aparece del récord que la defensa adujese ninguna causa o razón para la recusación de este jurado después de haberse tomado el juramento definitivo. A juzgar por sus manifestaciones, el fiscal entiende que el artículo 221 del Código de Enjuiciamiento Criminal no autoriza a la corte inferior para denegar la recusación perentoria solicitada por el acusado. Cita el ministerio público en su apoyo la doctrina sentada por este tribunal en *El Pueblo* v. *Rivera,* 37 D.P.R. 760, y *El Pueblo* v. *Munera,* 39 D.P.R. 295. En este último caso se estudia la jurisprudencia sentada por este tribunal interpretando el artículo 221 anteriormente citado, y se copian los siguientes párrafos de la decisión de esta corte en *Pueblo* v. *Vázquez,* 20 D.P.R. 361, 366:

"Alega también el apelante que la corte erró al no obligar al Fiscal a hacer sus recusaciones en el acto en que se presentaba cada jurado. Parece que el Fiscal pospuso sus recusaciones perentorias y la Corte admitió tal procedimiento, concediendo igual derecho a la defensa.

"El artículo 221 del Código de Enjuiciamiento Criminal dis-

pone que la recusación deberá hacerse al presentarse el miembro del jurado, y antes de que se le tome juramento para entender en la causa, y dispone también que, si para ello hubiera razón, el tribunal puede permitir que esto se haga después del juramento y antes de que el jurado se complete.

"Todo jurado presta dos juramentos, uno para contestar las preguntas que se le hagan con respecto a su capacidad para servir como tal y otro para actuar especialmente en la causa que se va a juzgar. Indudablemente que el juramento a que se refiere el artículo 221 del Código de Enjuiciamiento Criminal que hemos citado, es el segundo.

"Al parecer el procedimiento adoptado por el Fiscal en este caso no siguió estrictamente lo prescrito en la ley, pero no consta que estuviera en. completa oposición a la misma, pues si bien se consigna que el Fiscal pospuso sus recusaciones perentorias, no se demuestra que tal posposición se hiciera para después de haberse tomado juramento al jurado para actuar en la causa.

"Además, como hemos visto, la misma ley autoriza al juez para variar el orden que prescribe, cuando existen razones suficientes para ello, y como la jurisprudencia ha establecido que los jueces pueden resolver estas cuestiones ejercitando una sana discreción, People v. Montgomery, 53 Cal. 576; People v. Rodríguez, 10 Cal. 50; People v. Durrant, 116 Cal. 179, 197, tendría que demostrarse que la corte había abusado de su poder discrecional, para que el error que pudiera haber tal vez cometido sirviera de base a la revocación de la sentencia.

"Y por último, como bien dice el Fiscal de esta Corte Suprema en su alegato, 'el récord no demuestra que, después de resolver la corte la moción de la defensa y de invocar la regla que debía observarse en el empleo de las recusaciones perentorias por el Fiscal, éste hubiere recusado perentoriamente a ningún jurado, y no apareciendo así del récord, aun en el caso de que la corte hubiera incurrido en algún error, éste hubiera sido inmaterial, por no perjudicar ningún derecho sustancial del apelante."

En el caso de *El Pueblo* v. *Rivera,* supra, citado por el fiscal, se formuló excepción perentoria por la defensa a un jurado antes de haber prestado el juramento definitivo. La corte inferior estableció la regla de que los jurados admitidos por las partes después de las recusaciones perentorias se entenderían admitidos como miembros del jurado en el caso,

y basándose en estas razones denegó la excepción perentoria. El tribunal sentenciador interpretó erróneamente la ley y la sentencia fué revocada. Las recusaciones deben hacerse antes de que se tome juramento a los jurados para entender en la causa. Hasta ese momento las partes tienen derecho a recusar perentoriamente sin aducir causa. Después de prestado juramento únicamente puede permitirse la recusación cuando exista razón para ello.

En el caso de *El Pueblo* v. *Munera,* supra, esta corte, sin apartarse del criterio emitido en el caso de *El Pueblo* v. *Vázquez,* supra, dijo lo siguiente:

"El procedimiento más sencillo y que se ajusta mejor a la interpretación liberal del artículo 221 contenida en el caso de El Pueblo v. Rivera, supra, es el de insacular el número suficiente de jurados y tomarles el primer juramento. Acto seguido se procede a su examen y a las recusaciones motivadas. Luego a las perentorias. Si no hay recusaciones, se les toma el segundo juramento a todos. Si las hay, sin tomar el segundo juramento a los que queden, se insaculan nuevos y se sigue el mismo procedimiento. Cuando las partes aceptan finalmente el jurado o no hay más recusaciones motivadas y el número de las perentorias a que se tiene derecho se ha agotado, entonces se procede a tomar a todos los jurados a la vez el segundo juramento."

En las palabras que anteceden este tribunal recomienda a las cortes inferiores una práctica que a nuestro juicio debe ser observada. En el caso de *Mathis* v. *State,* 34 So. 287, resuelto por la Corte Suprema de Florida, se dice que la mejor práctica es posponer el juramento definitivo de los jurados hasta que se ha obtenido el panel completo, de modo que se prolongue todo lo posible el tiempo para las recusaciones perentorias; pero que en la ausencia de una disposición legal, la regla es que el tiempo y manera de jurar, después que se ha hecho el examen de los jurados para apreciar su capacidad, descansa en la sana discreción judicial de la corte, el ejercicio de la cual no debe ser perturbado por un tribunal de apelación a menos que se haya cometido un claro abuso de discreción. En dicho caso se tomó juramento antes

de completarse el jurado, a algunos miembros del mismo, y se negó a los acusados el derecho de recusar perentoriamente ciertos jurados después de haber prestado juramento definitivo. Aunque consideramos que debe observarse la práctica recomendada por nosotros y aceptada como buena por el tribunal de Florida, sin embargo, si el tribunal inferior no ha cometido un abuso de discreción y se atiene a las disposiciones de la ley, no es posible revocar una sentencia por el hecho de que no se haya ajustado estrictamente al procedimiento por nosotros aconsejado.

■ No procede la recusación perentoria después de haberse prestado juramento definitivo por el jurado que se intenta recusar. 35 C. J., pág. 416, pár. 479.

El artículo 1068 del Código Penal de California, que corresponde al 221 de nuestro código, dice, en su texto inglés, que la recusación debe formularse *when the juror appears, and before he is sworn to try the cause; but the court may for cause permit it to be taken after the juror is sworn and before the jury is completed.*

La última decisión que conocemos del estado de California interpretando este artículo, es la de *People* v. *Schmitz*, 94 Pac. 407, resuelto por la Corte de Apelaciones, Primer Distrito, en 1908. En dicho caso se negó la reconsideración por la Corte Suprema de dicho estado. Antes de exponer la doctrina sentada por el tribunal californiano, vamos a permitirnos copiar lo que dice la Corte Suprema de los Estados Unidos en *St. Clair* v. *U. S.,* 154 U. S. 147, porque, aunque la regla interpretada por el alto tribunal no es exactamente igual al estatuto de California, sin embargo, sus palabras indican la práctica establecida por algunos tribunales con respecto al momento en que deben presentarse las recusaciones:

"La regla 63 de la corte inferior dispone que 'en todas las causas criminales la designación, insaculación y recusación de los miembros del jurado se hará de conformidad con las leyes del estado entonces en vigor, excepto en tanto en cuanto las leyes del Congreso o las reglas de esta corte dispongan lo contrario; pero un miembro

del jurado será recusado o aceptado y juramentado en el caso tan pronto como se termine su examen y antes de que se inicie el examen de otro miembro del jurado.'

"Esta regla fué puesta en vigor durante el juicio de esta causa. Después que el primer miembro del jurado fué examinado respecto a si estaba o no capacitado, la corte anunció que debía tomársele juramento para juzgar el caso, a menos que fuese recusado por una u otra parte—alegando el acusado tener derecho a examinar todos los miembros del jurado sobre su capacidad antes de podérsele exigir que ejercitara el privilegio de presentar recusación perentoria a todos ellos.

"Esta cuestión general fué considerada cuidadosamente en los casos de Lewis v. United States, 146 U.S. 379, y en Pointer v. United States, 151 U.S. 396, 407, 410, 411. Refiriéndose al artículo 800 de los Estatutos Revisados, y a la ley de junio 30, 1879, capítulo 52, 21 Stat. 43, 44, dijimos en este último caso:

'Nada hay en estas disposiciones que sostenga la objeción interpuesta a la forma en que se constituyó el pequeño jurado. Respecto a los requisitos y exenciones de los miembros del jurado para servir como tales en las cortes de los Estados Unidos, las leyes del estado gobiernan la materia. Mas el Congreso no ha hecho que las leyes y costumbres relativas a la designación e insaculación de los miembros del jurado en las cortes de los respectivos estados sean aplicables a las cortes de los Estados Unidos, excepto en tanto en cuanto estas últimas, por una regla general en vigor o por orden especial en determinado caso adopten la práctica del estado a ese respecto. United States v. Schackleford, 18 How. 588; United States v. Richardson, 28 Fed. Rep. 61, 69.' . Se dijo además que 'en ausencia de tal regla u orden, el modo de designar e insacular los miembros del jurado para juzgar los casos en las cortes de los Estados Unidos cae dentro del dominio de las mismas, sujeto solamente a las restricciones que el Congreso ha prescrito, así como a aquellas limitaciones reconocidas por los principios consagrados de derecho penal esenciales para que jurados imparciales juzguen los delitos . . . En algunas jurisdicciones el modo acostumbrado para la recusación de los miembros del jurado es que tanto el acusado como el pueblo formulen sus recusaciones perentorias a medida que cada miembro del jurado—quien con antelación se ha determinado está capacitado y que no puede ser recusado motivadamente—se presenta para ser recusado o aceptado. Pero no es esencial que se adopte este método.' Refiriéndose a ciertas observaciones hechas

por el Juez Presidente Sr. Tindal, en el caso de Regina v. Frost, 9 Car & P. 129, 137, se dijo además: 'En relación con el informe del caso, ellas tienden a demostrar a lo sumo que la práctica en Inglaterra, al igual que en algunos de los estados era que las recusaciones perentorias a cada uno de los miembros del jurado—al tomársele el juramento de *voir dire* y al hallarse que estaba exento de toda objeción legal—fuesen determinadas antes de examinarse otro jurado para averiguar si estaba o no incapacitado. Mas en el caso de Frost ninguno de los jueces hizo indicación alguna de que ése fuera el único modo a seguir sin menoscabar los derechos del acusado a hacer recusaciones. La autoridad de las Cortes de Circuito de los Estados Unidos para considerar la cuestión relativa a la insaculación de jurados en casos criminales fué reconocida en el caso de Lewis v. United States, supra, sujeta a la condición de que tales reglas deben adaptarse en el sentido de asegurar todos los derechos del acusado'."

En el caso de *People* v. *Schmitz,* supra, la corte se expresó así:

"El tribunal, bajo las objeciones de la defensa, permitió las recusaciones de los jurados Harris y Bray. Después de haber sido examinados tres jurados y de tomado juramento para entender en la causa, el fiscal pidió permiso para recusar perentoriamente al jurado Harris. La corte entonces, sin que se le demostrase causa alguna y con la oposición de la defensa, permitió al pueblo recusar a dicho jurado perentoriamente. El artículo 1068 del Código Penal dispone que una recusación debe hacerse 'al presentarse el miembro del jurado y antes de que se le tome juramento para entender en la causa, pudiendo el tribunal, si hubiere razón para ello (*for cause*), permitir que ésta se haga después del juramento y antes de que el jurado se complete.' Es evidente que la corte no pudo, bajo este artículo, permitir sin causa una recusación, y que ésta debe basarse en algún hecho derivado de una demostración de hechos sobre la cual la corte pudo haber ejercido su discreción. Si la corte, después de haberse tomado juramento al jurado para entender en el caso, puede permitirle ser recusado sin causa, las palabras *for cause* deben ser eliminadas del estatuto. El código evidentemente intentó que después que un jurado ha sido examinado y ha tomado juramento solemnemente para entender en la causa, no puede, sino por una válida razón, recusarse caprichosamente por una de las partes. La persona que ha prestado juramento se convierte

en un jurado del caso y en una parte de la maquinaria de la corte. Es una parte del tribunal para el propósito de determinar la culpabilidad o inocencia del acusado. Este tribunal fué cambiado sin el consentimiento de la defensa y en interés de su adversario. Greer v. Norvill, 3 Hill (S.C.) 262. El acusado podía fundarse en el hecho de que el miembro del jurado había sido ya juramentado para ejercer el derecho que le asistía para formular sus propias recusaciones perentorias. El mandato del estatuto aparece pleno y debe ser observado. No conocemos ningún caso, y no se nos ha llamado la atención a ninguno en que tal recusación haya sido sostenida. En el antiguo caso de El Pueblo v. Rodríguez, 10 Cal. 59, la corte dijo: 'La recusación puede permitirse por una buena causa después de prestarse juramento por el jurado. En este caso no se ha demostrado una sana razón y la recusación fué debidamente rechazada.' Véase People v. Reynolds, 16 Cal. 132; People v. Scoggins, 37 Cal. 679; People v. Bemmerly, 87 Cal. 120, 25 Pac. 266; People v. Ward, 105 Cal. 338, 38 Pac. 945; People v. Durrant, 116 Cal. 196, 48 Pac. 75. En el caso últimamente mencionado, el Juez Henshaw, hablando a nombre del tribunal, estableció la regla correcta en las siguientes palabras: 'El artículo 1068 del Código Penal dispone que una recusación (ya sea perentoria o por causa) debe hacerse al presentarse el miembro del jurado y antes de que se le tome juramento para entender en la causa, pero la corte puede, si hubiera razón para ello, permitir que esto se haga después que el juramento ha sido prestado. No incurrió la corte en error, por lo tanto, al permitir que se examinase de nuevo al jurado sobre materias que vinieron a conocimiento del pueblo o del acusado después de la aceptación del jurado y antes de tomarse el juramento definitivo. El curso aquí seguido es el mismo observado en Pueblo v. Bemmerly, 87 Cal. 117, y aprobado por esta corte.' La misma regla se estableció en el caso de People v. Owens, 123 Cal. 488, 56 Pac. 251. Allí el jurado Spencer fué excusado por causa después que había sido juramentado para entender en el caso, habiéndose 'demostrado en virtud del examen correspondiente que el jurado, para dictar su veredicto, hubiera sido influído por su amistad con los familiares del acusado.' El artículo 371 del Código de Enjuiciamiento Criminal de Nueva York es en sustancia igual al 1068 de nuestro Código Penal. Este artículo dispone que 'una recusación debe hacerse al presentarse el jurado y antes de prestar juramento; pero que la corte puede, en su discreción, por una buena causa, retirar a un jurado en cualquier tiempo antes de haberse co-

menzado la práctica de la prueba.' La corte de Apelaciones, en People v. Hughes, 137 N.Y. 29, 32 N.E. 1105, dijo: 'La significación obvia del artículo 371 es que la recusación por causa que debe tomarse antes de prestarse el juramento, puede, sin embargo, hacerse después de acuerdo con la discreción del tribunal. Si no significa esto, necesariamente tiene que significar que la corte puede, por una buena razón, aunque no haya sido descubierta, retirar un jurado dentro de su discreción. Yo no creo que éste sea su significado ni su propósito. Si lo fuera, no habría una sana objeción posible de parte del abogado del acusado'.''

En el presente caso la defensa no estableció la base que requiere la ley para ejercer el derecho de recusar al jurado después de haber prestado el juramento definitivo. No se adujo razón alguna en apoyo de dicha recusación. La defensa estableció su excepción, cuando el secretario de la corte procedió a tomar el juramento a varios jurados, después de examinados y de formuladas por el acusado dos excepciones perentorias. No apeló la defensa a la discreción de la corte para que, posponiendo el juramento, le diese algún tiempo más para ejercitar sus derechos, limitándose a tomar excepción, por entender, según se deduce de su alegato, que la corte carecía de facultades para tomar juramento definitivo antes de haberse completado el jurado. Debe desestimarse el error apuntado.

■ Se alega por último que el tribunal inferior cometió error al condenar al acusado por un delito de homicidio voluntario, toda vez que el veredicto del jurado es contrario a derecho y a la prueba. A juicio de la defensa éste es un caso en que el acusado ejercitó legítimamente el derecho a la defensa propia. Hemos examinado detenidamente la prueba y no creemos que haya base para dejar sin efecto el veredicto rendido por el jurado. De acuerdo con el testimonio de los dos testigos oculares, Cándido Ortiz Pérez y Cipriano Cruz, el día 12 de marzo de 1933, como entre una y dos de la tarde, pasaba el interfecto, Antonio Mercado, por la carretera, a caballo, y al llegar frente a la casa de Cándido Ortiz Pérez, se detuvo, sin bajarse del caballo, a

hablar con Ortiz, que estaba en su casa, a la orilla de la misma carretera. A los pocos momentos pasó por allí el acusado apelante, también a caballo, y al ver a Mercado hablando con Ortiz lo llamó y le dijo: "¿En qué quedamos del encarguito aquél?" Entonces Mercado fué para donde él y le contestó: "Pues vé y búscalo si quieres, si no, déjalo." Entonces hubo algunas otras palabras entre ellos que los testigos no oyeron. Aquí se advierte alguna discrepancia entre los testigos oculares, pues mientras Cándido Ortiz Pérez declara que inmediatamente después de las palabras los dos se apearon de los caballos y se acometieron con los puños, el otro testigo ocular, Cipriano Cruz, asegura que Mercado, al acercarse al acusado, le tiró una gaznatada desde el caballo que montaba, y entonces fué que se tiraron de los caballos y se agarraron a pelear con los puños. En ese momento Mercado echó mano de un machete que el acusado llevaba en una de sus banastas, y le tiró, hiriéndole en un brazo. Avanzó entonces Torres, y empuñó a Mercado, arrojándolo al suelo. Estando ambos en el suelo corrieron hacia ellos los dos testigos oculares, Cándido Ortiz y Cipriano Cruz, y le quitaron el machete a Mercado, ayudándolos a ambos a ponerse de pie. Ya de pie el acusado se metió la mano en el bolsillo del pantalón y sacó una cuchilla curva. Mercado arrancó a correr, huyendo para detrás de la casa de Ortiz, persiguiéndole el acusado armado de su cuchilla. Mercado corrió hasta detrás de la casa, donde hay una cerca de alambre. Allí cogió un pedazo de palo de leña de cocinar que encontró, pero el acusado, que le había dado alcance, le asestó dos heridas con la cuchilla que portaba, sin que pudieran evitarlo los dos testigos. Una de estas heridas, de catorce pulgadas de extensión, fué la que produjo la muerte a Mercado a los pocos días de herido, a consecuencia de una peritonitis violenta. El testigo Cipriano Cruz, que es el que favorece más al acusado, declara que cuando Antonio Mercado se levantó, arrancó a correr para la cocina de Cándido Ortiz, y que allí cogió un palo en la mano y vino para encima

de Celestino Torres, y que entonces éste le hirió. Añade que Mercado no le tiró con el palo a Celestino porque estaba Cándido Torres por el medio y que no vió que le tirara después que se separó. La herida, según este testigo, fué producida de frente. El acusado no dice que corriera detrás del interfecto. Declara que trató de correr, que corrió un poquito, y vió que Mercado le iba a tirar y entonces se paró y lo empuñó; que corrieron como doce varas de distancia de donde estaban y que entonces intervino Cándido Ortiz, le quitó el machete a Mercado y lo botó, y que no los dejaron pelear más; que entonces no sacó la cuchilla; que ellos se metieron por el medio y él, Mercado, corrió a casa del Sr. Cándido Ortiz y en el *batey* cogió un palo; que entonces trató de huir pero que como estaba herido no pudo; que Mercado se le acercó y le dió un palo y al darle fué que sacó la cuchilla y lo cortó a él.

Esta es la prueba que tuvo bajo su consideración el jurado. La declaración de Cándido Ortiz demuestra que Mercado huyó y que fué perseguido por el acusado hasta detrás de la cocina del testigo, donde había una cerca de alambre. El hecho de que el interfecto hiciera uso de un palo al llegar à la referida cerca donde se paró, porque no podía caminar por allí, según manifiestan ambos testigos oculares, no revela que el acusado actuara en defensa propia. Cipriano Cruz no vió que Mercado le tirara con el palo a Celestino ni cuando Cándido Torres estaba por el medio ni después que se separó, aunque dice que Mercado vino para encima de Celestino Torres, cuando éste le perseguía. Este testigo dice, al terminar su testimonio y a preguntas del Fiscal, que vió corriendo a Antonio Mercado hasta la cocina de Cándido Ortiz donde se paró porque no podía correr más de .allí para allá debido a que había unos alambres; y que allí detrás de la cocina fué que cogió el palo. A preguntas de la defensa dice que había unos alambres y que estaban abiertas las puertas de la cocina por donde una persona podía meterse y salir de un sitio a otro.

Celestino Torres dice que sacó la cuchilla cuando Mercado se le acercó y le dió un palo, lo que está en pugna con la declaración de los testigos oculares que vieron al acusado correr detrás de Mercado, cuchilla en mano, hasta que le infirió las heridas que le acasionaron la muerte.

*Examinada la prueba que sirvió de base a la decisión del jurado, creemos que el veredicto debe ser sostenido y confirmarse la sentencia apelada.*