EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* CÁNDIDO MARRERO FERNÁNDEZ, JUAN PEDRO MARRERO FERNÁNDEZ y JOSÉ MIRANDA ORTIZ, acusados y apelantes.

No. 5362.—*Sometido:* Abril 26, 1935. *Resuelto:* Julio 19, 1935.

*Agustín E. Font,* abogado de los apelantes; *R. A. Gómez, fiscal,* y *Luis Janer, fiscal auxiliar,* abogados de El Pueblo, apelado.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

La acusación, base de este proceso, copiada a la letra, en lo pertinente, dice:

"En la Corte de Distrito de Ponce, Puerto Rico, a 27 de junio de mil novecientos treinta.

"El Fiscal formula acusación contra José Calazán Marrero, conocido por Blanquillo Marrero, Juan Pedro Marrero, conocido por Bobo, Cándido Marrero, conocido por Macán, José Miranda y Pablo Pomales, por el delito de ASESINATO (FELONY) cometido de la manera siguiente:

"Porque los referidos acusados José Calazán Marrero, conocido por Blanquillo Marrero, Juan Pedro Marrero, conocido por Bobo, Cándido Marrero, conocido por Macán, José Miranda y Pablo Pomales, allá en o por el día 7 de junio de 1930 y en el barrio Caonilla Arriba sitio Dajao del término municipal de Villalba, que forma parte del Distrito Judicial de Ponce, P. R., voluntaria, ilegal y maliciosamente, con premeditación y deliberación, y demostrando cada uno de los acusados tener un corazón pervertido y maligno, dieron muerte ilegal al ser humano Ramón Martínez Ríos, policía insular, acometiéndole y agrediéndole con puñal, arma mortífera, infiriéndole varias heridas en distintas partes del cuerpo, entre ellas algunas graves, a consecuencia de las cuales falleció horas después el citado Ramón Martínez Ríos."

En julio 24, 1930, los acusados excepcionaron la acusación alegando que ésta en la forma que estaba redactada no imputaba delito público alguno ni menos el de asesinato en primer grado y la contestaron alegando su inocencia y solicitando juicio por jurado. La corte declaró la excepción sin lugar, haciendo constar la alegación de inocencia de los acusados.

En octubre 1, 1931, los acusados pidieron a la corte que

ordenara al fiscal que les proporcionara un pliego de especificaciones. Su petición fué desestimada el 5, y el 7 del propio mes y año fué llamada la causa para juicio durando éste hasta la madrugada del 10, en que el jurado rindió su veredicto declarando a Cándido y Juan Pedro Marrero culpables de asesinato en segundo grado, a José Miranda culpable de homicidio voluntario y no culpables a José Calazán Marrero y Pablo Pomales.

Acto seguido la corte dictó sentencia absolviendo a los acusados declarados no culpables y señaló día para pronunciarla en cuanto a los declarados culpables. Éstos presentaron una moción de nuevo juicio que fué finalmente declarada sin lugar en noviembre 17, 1931. El 4 de diciembre siguiente la corte de distrito dictó sentencia condenando a Cándido Marrero a sufrir doce años de presidio, imponiendo igual pena a Juan Pedro Marrero y la de seis años de presidio a José Miranda.

No conformes los acusados condenados apelaron. La transcripción, que contiene 856 páginas, quedó archivada en la Secretaría de esta corte en diciembre 9, 1933. En mayo 22, 1934, presentaron los apelantes su alegato, señalándose la vista del recurso para noviembre 6, 1934. Pidió el fiscal la suspensión con la conformidad de los apelantes. Señalada de nuevo la vista, fué suspendida otra vez por estipulación de ambas partes, celebrándose por último en abril 26, 1935, fecha en que el caso quedó definitivamente sometido a la consideración y resolución del tribunal.

Imputan los apelantes la comisión de veinte y dos errores a la corte sentenciadora, y los argumentan extensamente. El primero se refiere al pliego de especificaciones y el segundo a la constitución del jurado; el sexto a cierta actitud hostil atribuída al juez que presidió el juicio y el séptimo y el octavo a manifestaciones hechas por el fiscal en su informe al jurado; por el vigésimo se impugnan las instrucciones de la corte al jurado, por el vigésimo primero se sostiene que el veredicto del jurado es contrario a la ley y

a la prueba y por el vigésimo segundo que debió concederse un nuevo juicio. Los catorce restantes guardan relación con la práctica de la prueba.

■ Examinemos la cuestión referente al pliego de especificaciones. Conocemos la acusación. Estimando que no era suficiente para su defensa, los acusados pidieron a la corte que ordenara al fiscal que les proporcionara los siguientes detalles:

"(A) Circunstancias concurrentes a la perpetración del hecho.

"(B) Especificar las heridas sufridas por el interfecto Ramón Martínez Ríos, y la naturaleza de dichas heridas.

"(C) La participación específica de cada coacusado en cuanto al acometimiento y a la agresión y a las heridas que cada uno infiriera a Ramón Martínez Ríos.

"(D) Cuál de los coacusados usó un puñal o si cada uno de los coacusados usó indistintamente un puñal ¿cómo era ese puñal, y en qué momento, en el orden cronológico de los acontecimientos, fué usado ese puñal?"

Conocemos la acusación. A nuestro juicio es suficiente, ya que contiene todos los elementos esenciales del delito que imputa a los acusados e informa a éstos con certeza a los efectos de prepararse debidamente para su defensa.

Pudo quizá la corte de distrito conceder algo de lo pedido adoptando una actitud más liberal en armonía con la jurisprudencia sobre la materia, (*El Pueblo* v. *Pacheco,* 33 D.P.R. 224; *El Pueblo* v. *Ramírez,* 28 D.P.R. 313; 49 C. J. 626), pero no es posible sostener que abusara de su discreción al actuar en la forma en que lo hizo. No surge de los autos que los acusados sufrieran perjuicio.

El criterio rígido de la corte sentenciadora encuentra apoyo en lo resuelto por esta Corte Suprema en el caso de *El Pueblo* v. *Vélez, et al.,* 32 D.P.R. 382, 384. En él se dijo:

"El apelante se queja de que no fué notificado por la acusación de que a él se acusaba de haber ayudado en el acto del disparo pero que la acusación única y exclusivamente le imputaba el acto de disparar. La cuestión es, pues, si cuando un hombre tiene un

juicio por separado y la acusación contra varias personas imputa sólo el acto de disparar, el acusado puede quejarse de una falta de notificación con respecto a que a él se le acusaba del homicidio.

"Independientemente de todos los estatutos que consideran a un cómplice antes del hecho como un principal, la ley era que cualquier persona que estaba presente ayudando era un principal. En el caso de Mckelley, 9th Coke 67 B. 77 Reprint 832, se usaron las siguientes palabras:

" 'De modo que si a A. B. & C. se les acusa de haber dado muerte a J. S. y que A. lo golpeaba y los otros estaban presentes, ayudando, y de la prueba aparece que B. dió el golpe y que A. y C. estaban presentes, etc., en este caso la acusación no se ajusta a las circunstancias; y sin embargo es suficiente para sostener la acusación, pues la prueba está de acuerdo con el efecto de la acusación y por tanto la variante de las circunstancias de la acusación no es esencial; pues considerará la ley que la herida ha sido causada por cada uno de ellos y que es tan vigorosamente el acto de todos los otros como si los tres juntos hubieran cogido el arma, etc., y todos a un tiempo hubieran golpeado al interfecto.'

"En el caso de Sir John Heyden, 11 Coke, 5 B, 7 Reprint 1151, se dijo que el acto de uno es el acto de todos los del mismo grupo que estaban presentes y en Commonwealth v. Chapman, 11 Pick, 428, se dijo: 'La prueba de que una persona estaba presente ayudando sostendría una acusación en que se le imputa como único principal o autor el hecho de haber dado el golpe con sus mismas manos.' Otro razonamiento en el mismo sentido puede verse en algunos de los casos que luego citaremos con otro fin.

"Aun cuando el acusado hubiera meramente ayudado en el acto de la muerte, sin estar realmente presente, una acusación que imputa el acto de dar muerte es suficiente para declarar culpable a cualquiera que anteriormente hubiera sido conocido, como cuestión general, como un cómplice antes del hecho. La cuestión alegada como error está comprendida en el artículo 36 del Código Penal, el cual es como sigue:

" 'Artículo 36.—Todas las personas complicadas en la comisión de un crimen, ya fuera "felony" o "misdemeanor", y que directamente cometieren el acto constituvo del delito, o no hallándose presentes, hubieran aconsejado su comisión o incitado a ella; y todas las personas que aconsejaren o incitaren a menores de catorce años, lunáticos o idiotas, a cometer algún crimen; o que, por medio de fraude, artificio, o violencia, ocasionaren la embriaguez de otra per-

sona con el fin de hacerle cometer un crimen, son principales o autores en el crimen cometido.'

''Y más particularmente en el artículo 93 del Código de Enjuiciamiento Criminal, el cual prescribe lo siguiente:

'' 'Artículo 93.—En la acusación contra personas que han tenido participación en la perpetración de un delito grave (*felony*), ya hayan cometido directamente el hecho constitutivo del delito o hayan ayudado a llevar a término la comisión del mismo, aunque ninguna persona sea perseguida, juzgada y castigada como autor, no necesita exponerse hecho alguno fuera de los necesarios en la acusación contra el autor.' ''

Y en lo decidido recientemente en el caso de *El Pueblo* v. *Coto*, 48 D.P.R. 147, 148, a saber:

''La acusación presentada contra el apelante y Arcadio Colón les imputa que el día 30 de junio de 1930 en Coamo, P. R., voluntaria e ilegalmente, con malicia (premeditación y deliberación) y con propósito firme de dar muerte ilegal al ser humano Juan Marrero Hernández, alevosamente lo acometieron y agredieron con un martillo, arma mortífera, produciéndole la fractura del cráneo, lesión ésta que le causó la muerte casi instantáneamente al citado Juan Marrero Hernández.

''Al ser leída esa acusación solicitó el abogado de ambos acusados que la corte ordenase al fiscal que hiciera más específica su acusación (*bill of particulars*) a fin de que informe cuál de los acusados agredió con el martillo a Juan Marrero Hernández, pero la corte no accedió a esa pretensión. Entonces los acusados solicitaron juicio separado y ante jurado. Esa solicitud de especificación fué reproducida por el apelante el día señalado para su juicio, antes de procederse al sorteo de los jurados pero también le fué negada. Tal negativa se alega fué errónea en el primer motivo de este recurso.

''La acusación imputa claramente a los acusados el delito de asesinato y cumple con lo requerido por el artículo 71 del Códigο de Enjuiciamiento Criminal, pues contiene una exposición de los hechos constitutivos del delito en lenguaje conciso y corriente, de tal modo que cualquier persona de inteligencia común puede entender por ella que los acusados con premeditación y alevosía dieron muerte a Juan Marrero Hernández al causarle la rotura del cráneo con un martillo. No era necesaria mayor especificación respecto a cuál de ellos produjo la herida causante de la muerte pues

esto es materia de prueba, ni el apelante demostró en la corte inferior ni tampoco ahora ante nosotros que la falta de la especificación por él solicitada impidiera o dificultara su defensa, pues esos hechos estaban en su conocimiento. Por consiguiente, entendemos que la corte inferior no abusó del poder discrecional que tiene para ordenar mayor especificación de la acusación.''

■ Veamos el segundo señalamiento de error. Cuando se estaba constituyendo el jurado y cuando ninguna de las partes había agotado sus recusaciones perentorias, se preguntó al fiscal si tenía alguna recusación perentoria que hacer y contestó: ''Por ahora, no.'' Intervino la defensa y pidió a la corte que estableciera la regla que si el fiscal no iniciaba dichas recusaciones y ella no recusaba, el fiscal no tendría derecho a recusar después, y la corte no accedió. Luego se permitió al fiscal que recusara perentoriamente un jurado y la defensa tomó excepción.

El artículo 229 del Código de Enjuiciamiento Criminal, dice:

''Todas las recusaciones de un miembro del jurado, excepto la perentoria, deben presentarse, primero por el acusado o su defensor y después por el fiscal, y cada una de las partes debe agotar todas las recusaciones a que tiene derecho antes que la otra empiece a presentar las suyas.''

Y el 231 del propio Código prescribe:

''Si todas las recusaciones de una u otra parte han sido denegadas, puede cada una de ellas, primero el fiscal y luego el acusado, interponer recusación perentoria, a no haberse agotado las recusaciones perentorias de ambas partes.''

Esos artículos parecen dar la razón a los acusados. Sin embargo, no obstante regir los mismos preceptos legales en California, la jurisprudencia en dicho estado, tal como se resume por Pomeroy en sus ''Codes of California Annotated —Penal Code,'' pág. 390, ha resuelto:

''Cuando el fiscal pasa el panel al acusado y éste se niega a presentar recusaciones, puede permitirse al fiscal que recuse a uno de los miembros del jurado: Pueblo v. McCarty, 48 Cal. 558. Véase

Pueblo v. Doolan, 96 Cal. 315, en que se permitió al fiscal que recusara perentoriamente a un miembro del jurado que ya había sido pasado una vez por El Pueblo. Véase también Silcox v. Lang, 78 Cal. 118, y Pueblo v. Majors, 65 Cal. 138, 52 Am. Rep. 295, que se pronuncian en el mismo sentido. Y el fiscal puede recusar a un miembro del jurado después de habérsele tomado juramento cuando existen buenos motivos para ello: Pueblo v. Bemmerly, 87 Cal. 117.''

Y es que la cuestión descansa grandemente en la discreción de la corte. Consúltese el caso de *Pueblo* v. *Torres,* 48 D.P.R. 39, en el que se analizan los de *Pueblo* v. *Munera,* 39 D.P.R. 295, *Pueblo* v. *Rivera,* 37 D.P.R. 760 y *Pueblo* v. *Vázquez,* 20 D.P.R. 361, y se establecen reglas que guardan relación con la cuestión aquí envuelta.

Además aunque se concluyera que la actuación de la corte no se había ajustado estrictamente a la ley, el error carecería de importancia a los efectos de la revocación de la sentencia porque el jurado fué finalmente aceptado por ambas partes. A la página 130 de la transcripción aparece lo que sigue:

''Fiscal Sr. Pérez Almiroty.—Ninguna otra pregunta, señor Juez.—Juez.—La defensa, perentoria. . . . Defensa.—No tengo ninguna recusación perentoria. Aceptado el jurado.—Juez.—Entonces se acepta el jurado por ambas partes. ¿Se acepta el jurado por ambas partes?—Contestan 'Sí' las dos partes.—Defensa.—Sí, señor.— Juez.—Entonces tome juramento definitivo.''

La actitud hostil del juez de distrito a que se refiere el sexto señalamiento de error la encuentran los acusados en lo que sigue, página 640 de la transcripción:

''DEFENSA.—Cuando declaró el testigo Daniel Rivera o Figueroa, sentamos las bases para impugnarlo. Vamos a usar para ello el testimonio de Nemesio Santiago.

''DECLARACIÓN JURADA DE NEMESIO SANTIAGO.

''JUEZ.—Mire, usted va a hablar en voz alta, de modo que se le oiga, cuando le pregunten. Si yo tengo que decirle tres veces a usted que hable en voz alta, yo lo voy a castigar por desacato, porque entonces usted desobedece a lo que yo le digo. De modo que cuídese mucho de hablar en voz alta. Pregunte la defensa.

DEFENSA.—P.—¿Cómo se llama usted?—R.—Nemesio Santiago —JUEZ.—Eso es bajitito.—TESTIGO.—Nemesio Santiago.—JUEZ.—Más duro, grite más.—TESTIGO.—Nemesio Santiago.—JUEZ.—Así.—DEFENSA.—P.—¿Dónde usted vive?—R.—En la Ortiga.—P.—¿A qué se dedica usted?—R.—Me dedico a decir la verdad.—JUEZ.—P.—No. ¿A qué trabajo se dedica usted? La ocupación suya, su trabajo. —DEFENSA.—La ocupación suya, su trabajo.—R.—Yo, a trabajar en un ventorrillo.''

La verdad es que el juez no tenía necesidad de advertir al testigo lo del desacato y que el hecho considerado aisladamente llama la atención, pero seguidos cuidadosamente todos los incidentes del juicio, tomadas en consideración las muchas veces que el juez se había visto obligado a indicar a los testigos que hablaran en voz alta, se explica lo ocurrido, que no consta en manera alguna que influyera en un sentido o en otro en la declaración del testigo ni que produjera el más leve perjuicio a los acusados.

Lo mismo sucede con los errores séptimo y octavo. El séptimo se plantea como sigue:

''El fiscal, en los comienzos de su informe al jurado, afirmó a los señores del jurado que la gente a donde iba el policía (la casa de los acusados) era gente mala. La defensa interrumpió al fiscal, alegando que el carácter de los acusados no había sido objeto de prueba; que el fiscal no podía entrar en ese terreno por ese motivo y porque, además, si la defensa no había planteado la cuestión del carácter de los acusados, el fiscal estaba impedido de hacerlo. El fiscal reconoció su error (véase página 787 de la T. de la E.); pero insistió en ello al hacer, en forma admirativa, el siguiente comentario, mientras se dirigía al jurado:—'¡Son muy buenos los acusados!' (páginas 786 y 787 de la T. de la E.)''

Y el octavo, así:

''El fiscal, al dirigirse al jurado, impropiamente comentó los términos de una decisión de esta Corte Suprema sobre el Hábeas Corpus que los propios acusados sometieron a este alto tribunal (*Ex parte* Marrero, 41 D.P.R. 695.) (Páginas 792–793 de la T. de la E.)''

No se consigna cuál fué el comentario. Tampoco aparece del récord.

Basta la exposición hecha por los mismos apelantes para concluir que se trata a lo sumo de meras desviaciones de la buena práctica que no constituyen errores capaces de producir la revocación de la sentencia, desviaciones que se corrigieron, además, en el primer caso, por el propio fiscal, y en el segundo por la corte que, según consta a la página 793 de la transcripción, dijo al jurado lo que sigue:

"Juez.—La Corte va a intervenir. La Corte va a decir a los señores del jurado lo siguiente: aquí se ha hablado de ese recurso de hábeas corpus. Cuando se resuelve un recurso de hábeas corpus lo que se resuelve es si hay un principio de prueba, si hay un principio de prueba para arrestar, pero no se resuelve definitivamente sobre la culpabilidad, o inocencia de los acusados. Esa cuestión es ahora para el jurado este que está presente aquí después que se le someta el caso a su deliberación y resolución; este jurado es el único que debe resolver sobre la culpabilidad, o inocencia de los acusados. Eso es lo que significa el recurso de hábeas corpus; pero la resolución que diera el Tribunal Supremo no prejuzga la resolución final de este caso, que está sujeta, por la prueba presentada, a la apreciación del jurado. Ésa es la realidad de la cuestión legal.

"Defensa.—Exactamente.

"Juez.—Entonces no hay que discutir más sobre eso."

No nos detendremos a expresar por escrito nuestro juicio con respecto a los errores que guardan relación con la práctica de la prueba y las instrucciones de la corte al jurado. Uno a uno han sido expuestos y discutidos por los apelantes en su alegato y uno a uno explicados y contestados por el fiscal en el suyo. Todos se refieren a cuestiones ya resueltas por la jurisprudencia y tras una detenida consideración de las circunstancias concurrentes, estamos en condiciones de afirmar que ninguno, de haberse cometido, sería suficiente para producir la revocación de la sentencia. Un estudio completo del récord revela lo bien y ampliamente que los acusados fueron defendidos, la imparcialidad de la corte y la cuidadosa y liberal actuación del jurado al apreciar la prueba en la forma en que lo hizo, declarando no culpables a dos de los acusados, y culpables sólo de asesinato en segundo

grado y de homicidio a los otros tres. Tan fuerte es la impresión que la lectura de la transcripción produce en el ánimo del juzgador que, al terminarla, en su conciencia sólo se oye una voz que dice, lo más que el jurado pudo hacer en favor de los acusados, conservándose fiel al juramento que prestara, fué actuar en la forma en que lo hizo. Esto nos lleva al estudio y resolución del señalamiento de error número veinte y uno, por el que se sostiene que el veredicto es contrario a la ley y a la evidencia.

Ésta comenzó por el testimonio de los doctores López Nussa y Américo Serra. El primero reconoció en un hospital de Ponce y operó a Ramón Martínez Ríos en la madrugada del ocho de junio de 1930. El segundo practicó la autopsia de su cadáver horas después. Tenía tres heridas leves, una en la cara y dos en la región lumbar, y tres graves, una en la región torácica que penetró en la pleura, otra que interesó el hígado y otra que perforó el intestino grueso, causadas con arma cortante como puñal o cuchillo. La muerte sobrevino como a eso de las tres de la tarde del mismo día, a consecuencia de hemorragia y peritonitis aguda, según el doctor López Nussa; de hemorragia y *shock,* según el doctor Serra, producidos por las heridas.

¿Quién era Ramón Martínez Ríos, y cómo y por quién o por quiénes fué herido? Cándido Ramos, vendedor ambulante, declaró en el juicio que en la noche del siete de junio de 1930 fué con su batea de dulces acompañado de su hijo Ramón Ramos a la casa del acusado José Calazán Marrero, situada en Villalba, barrio de Caonilla Arriba, lugar conocido por Dajao, donde se celebraba un baile, y se colocó frente a la puerta que daba a la cantina perteneciente a los acusados José Miranda y Cándido Marrero instalada en la casa y en la que se vendían galletas, pan, dulces y licor.

Ya empezado el baile, llegó Ramón Martínez Ríos, Policía Insular, vestido de uniforme. Amarró su caballo. Dió una vuelta por donde estaban los dulceros y se paró a su lado. Alguien pidió un palo de ron en voz alta, lo oyó el policía,

penetró en la casa y ocupó el licor. Mientras eso ocurría fué maltratado de palabra por los dueños de la cantina, contestando al retirarse en su caballo con el licor, "voy a llevarlo al Limón, vuelvo después."

Volvió en efecto como a la media hora, amarró su caballo, subió al balconcito de la casa y se paró en la puerta y José Calazán le dijo que hiciera el favor de retirarse y lo cogió por los brazos. En ese momento el acusado Pedro Marrero que estaba detrás de José Calazán le dió por la cabeza y el policía cayó y en el suelo José Miranda y Cándido Marrero le infirieron varias puñaladas.

No le vió arma a Miranda. Cándido tenía un cuchillo que había visto en la cantina primero y después que se fué el policía en su pretina. Preguntado si el policía había sacado su revólver, contestó: "¡Cómo lo iba a sacar, si estaba achocado en el suelo!"

José Calazán ayudó a quitarle la gente de encima y a subirlo a la casa donde le dió a beber un poquito de leche.

Acto seguido fué llamado a declarar Ramón Ramos, que estaba con su padre ayudándolo en su negocio, corroborando su declaración.

Tras los Ramos ocupó la silla testifical Daniel Figueroa, trabajador de la tierra, que miraba el baile. Dijo que vió llegar al policía Martínez dos veces, la primera como a las nueve de la noche cuando ocupó el licor que estaba debajo del mostrador de la cantina en botellas. La cantina era de José Miranda y Cándido Marrero. Miranda le dijo que no tenía autorización para ocupar el licor y él contestó que él tenía que cumplir con la ley. Después que se fué, "Cándido Marrero se tiró con un cuchillo en la cintura."

Volvió el policía a caballo, solo, y cuando llegó a la puerta José Calazán le dijo: "Martínez, retírese, que hay peligro" y lo empuñó por los molleros, dándole un golpe en la sien izquierda Juan Pedro Marrero. "Cayó al suelo; y al caer al suelo, vino Cándido Marrero y le dió una puñalada en el pecho, y después le segundó la otra por aquí."

El policía pidió auxilio a Juan Marrero y éste acudió y dijo: "El que le dé más a Martínez me tiene que matar a mí." Lo subieron a la casa, lo sentaron en un tablerito y José Calazán le dió una copa de leche. Después lo llevaron en una hamaca hasta la hacienda Limón de MacJones y allí lo colocaron en una guagua para llevarlo a Ponce.

Juan Ortiz fué llamado entonces a declarar. Sólo tiene catorce años de edad. Es familiar de los Marrero y estaba mirando el baile. Conocía al policía y presenció cuando al subir al baile José Calazán le dijo: "Martínez, retírese" y cuando Pedro Marrero expresó: "Yo soy tan hombre como él" y le agredió por la sien izquierda y el policía "se cayó, se tumbó." Caído "Cándido Marrero le metió el puñal." "Según le dió la puñalada, yo cogí miedo." Y corrió. Esperó en el camino hasta que pasaron al policía en la hamaca y se fué tras él hasta el Limón.

Juan Romero tocaba el güiro en el baile. Vió las dos veces al policía. La segunda "cuando sentí el revolú, solté el güiro y me he asomado a la ventana, y cuando me asomé por la ventana, lo tenía Marrero, Blanquillo, empuñado por los encuentros. . . Pablo Pomales, por las piernas. . . y José Miranda lo desarmó, y Macán le sumbó una puñalada por aquí, pero yo no sé si el cuchillo cogió para acá, o para acá. . . Yo, por no ver dándole más, me tiré abajo. . . Y como a los diez minutos fuí allá a verlo. . . Estaba sentado. . . me acerqué. . . soltaba sangre por aquí, por la cara; y él abrió los ojos así, y me dijo: 'Juan, coge el caballo, y ve a dar cuenta.' Entonces cuando fuí a coger el caballo, Tití Marrero me tiró del freno. . . yo me tiré y fuí donde el hermano mío y le dije: 'Antonio, ¿voy o no voy?' Entonces llamé al testigo ese Figueroa y me cogió el freno por la mano, me monté, y fuí a la hacienda y le dije a MacJones, el americano de Villalba", lo que había pasado.

Rosa Burgos, una de las mujeres que se encontraban en el baile, fué llamada por el Pueblo a declarar. Oyó a José Calazán decir a Martínez "Retírese" y vió pasar a Cándido

Marrero para encima de Martínez. Nada más vió porque se retiró a un cuarto. Al poco rato salió y "ví a Martínez sentado, que tiraba a limpiarse y no podía, y le quité el pañuelo y lo limpié. . . la sangre que tenía aquí. . . Le pregunté: "¿Tiene conocimiento de quién lo agolpeó?—Sí.— ¿Quién lo agolpeó?—José Miranda y Cándido Marrero.— Pero yo me retiré y me fuí. Estaba solo. Sentadito. . . Yo me asusté y me fuí. . . . Él quedó hablando solo. . ." El acusado Cándido Marrero es yerno suyo. José Miranda no es su familiar.

El siguiente testigo fué Arturo Figueroa Plata, bracero, que llegó al baile después del suceso. "Cuando yo lo ví (al policía) estaba ya herido y sentado en un banco . . . Le dije a don Blanco que cómo había pasado eso en su casa . . . Me contestó que eso había pasado como en cinco minutos y no se había dado cuenta. . . El policía Martínez Ríos entonces me dijo: 'Arturo, ven acá'. . . me dijo: 'Don Blanco me aguantó, Macán me hirió, Pablo Pomales me hirió, y José Miranda me hirió, y Bobo me dió este golpe. . . Me dijo que me lo trajera, que estaba grave. . . Pedí una hamaca. . . el señor Blanquillo. . . la mandó buscar. . . y cuando estuvo preparada, lo eché en la hamaca y me vine con él." Lo acompañaron Herminio Figueroa, Félix Ortiz, Juan Rodríguez y Daniel Figueroa. Lo llevaron a la hacienda Limón donde "ya Mr. MacJones estaba preparado con la guagüita . . . y me mandó con él al Hospital de Distrito de Ponce."

En el camino el Juez de Paz de Villalba tomó una breve declaración al policía cuya presentación en evidencia dió lugar a varios incidentes. Bien pudo el fiscal prescindir de ella, y evitar complicaciones innecesarias ya que todo lo en ella manifestado lo conocía el jurado a través de las declaraciones de Arturo Figueroa y Rosa Burgos.

Dejaremos en tal virtud de hacer mención de la declaración del Juez de Paz de Villalba, Jesús María Santiago. También de las de Juan Soltero y Leandro Curet, policías insulares, y de la declaración escrita del acusado Pomales

cuya presentación dió lugar a dilatados incidentes y excepción, cuando sólo se trataba de una mera repetición de lo ya dicho con todos sus detalles por los testigos presenciales que conocemos. Diremos que el Pueblo aportó otros testimonios de menor importancia y terminaremos nuestro análisis refiriéndonos a la declaración de Juan Marrero Torres, testigo anunciado por el fiscal como hostil, anuncio que suscitó otro largo incidente.

Vivía en Coamo, tenía una tienda y fué al baile dado en la casa de su tío José Calazán Marrero. Conocía al policía insular Martínez. Se observa que evade toda manifestación que tienda a incriminar a determinada persona. Músico por afición, estaba tocando una plena cuando ocurrió el suceso. La gente dejó de bailar, las mujeres corrieron para el cuarto y él se dirigió hacia el sitio en que estaba el policía en el suelo rodeado de un grupo de personas.

Se le pregunta por sus nombres y contestó: "Yo no recuerdo ninguna, porque la única idea mía fué salvarle, y fuí muy rápidamente donde estaba él. . . me dijo que estaba herido. . . echaba sangre por la sien izquierda. . . me acosté encima de él y lo protegí: contra el pecho mío el pecho de él. . . sentí un rasguño. . . por la espalda mía. . . no sabe quién se lo dió. . . al público dije 'para matarlo a él, me tienen que matar antes a mí'. . . cuando me levanté no estaba nadie allí. . . estaba bien herido (Martínez). . . lo conduje al banco que había en la sala. . . le quité la guerrera. . . . dijo que tenía calor. . . entonces vió la camisa manchada de sangre . . no oyó detonación alguna."

A preguntas de la defensa contestó que oyó cuando el policía dijo: "Don Blanco, no me deje matar," contestando Don Blanco: "No le tire nadie; no le den a un hombre en el suelo."

Presentó entonces la defensa su prueba. Acepta la celebración del baile en casa del acusado José Calazán Marrero, la llegada del policía Martínez y la ocupación del licor. Tiende a demostrar que dicha ocupación fué indebida y que

el policía amenazó con volver para acabar con los guapos; que volvió en efecto no obstante haberse encontrado por el camino con Felipe Vázquez que le aconsejó que no lo hiciera, diciendo al llegar, "vengo a probar los guapos"; que José Calazán intervino en buenas formas tratando de evitar cuestiones, diciéndole "Martínez, no me haga esto en mi casa;" y, como dijo en sus propias palabras uno de los testigos, "de abajo entonces lo jalaron, el grupo de gente que había, lo jaló; y entonces, cuando lo jalaron decía, 'don Blanco, no me deje matar, no me deje matar'. . . y don Blanco intervino diciendo que a un hombre en el suelo no se le tiraba."

Deja dicha prueba en la oscuridad los nombres de los autores directos del crimen, aunque contiene insinuaciones que tratan de presentar al hijo del dulcero, el testigo de cargo Ramón Ramos, como el autor de las puñaladas a Martínez.

Una gran parte del esfuerzo de la defensa se dirigió a la impugnación de los testigos de cargo, esfuerzo que a nuestro juicio le resultó contraproducente pues lo que palpita en todo el proceso como algo enteramente cierto es la existencia de amenazas por parte de los Marrero para impedir el esclarecimiento de los hechos, llevando la confusión a la investigación preliminar. Pasó el tiempo. Las aguas volvieron a su nivel. Los testigos se sintieron garantizados e instados a declarar lo hicieron con toda amplitud en el juicio.

Difícil es resumir con acierto y en justicia en pocas palabras prueba tan larga como la en este caso practicada. Hemos tratado de referirnos a lo esencial y de omitir todo lo que se impugnó por inadmisible, y creemos que de lo consignado surge clara, inevitable, creídas como fueron por el jurado las declaraciones de los testigos presenciales de cargo, la culpabilidad de los acusados apelantes.

Pudo el jurado condenarlos a todos. No lo hizo. La prueba con respecto al dueño de la casa, Blanquillo, José Calazán Marrero, era susceptible de dos interpretaciones, y adoptó la favorable a su inocencia. Concluyó que el sujetar por los brazos al policía, momento aprovechado para ases-

társele el golpe en la sien izquierda que lo derribó al suelo, se debió no a su connivencia en el ataque sino a su deseo de evitar disgustos; dió crédito a lo dicho por algunos testigos con respecto a su intervención posterior tratando de evitar que se le siguiera golpeando en el suelo, mitigando su sed y proporcionando la hamaca en que se le condujo al Limón, y lo absolvió.

Lo mismo actuó en cuanto a Pomales. Su intervención en el hecho de acuerdo con algunas de las declaraciones pudo llevarlo a ser considerado como un cooperador directo, como un principal o autor. Sin embargo, siendo las imputaciones imprecisas, prefirió darle el beneficio de la duda, y lo absolvió.

El caso de Miranda, declarado culpable de homicidio voluntario, muestra además lo cuidadoso que fué y su deseo, llevado hasta el límite, de ser benévolo al par que justo. Pudo declararlo culpable de asesinato. Existía prueba abundante de su intervención directa en el ataque que dió por resultado la muerte de Martínez horas después, pero estimó quizá que el no uso de arma alguna por su parte justificaba la calificación de su actuación como homicidio.

En cuanto a los Marrero, Juan Pedro y Cándido, conocidos por el Bobo y Macán, los actos por ellos realizados puestos de relieve de modo tan claro y firme por la prueba, no podían ser calificados de otro modo que como lo fueron, esto es, de asesinato. Y aún en cuanto a ellos fué benigno el jurado, pues pudiendo llegar hasta el primer grado, se detuvo en el segundo.

Es cierto que el policía no tuvo necesidad de ir la segunda vez al baile. Aceptando que fuera hombre no sólo de valor, sino temerario. Partiendo de la base de haber llegado la segunda vez de modo arrogante y retando. Aún así, no existiendo la más leve prueba de que atacara a alguien, de que hiciera uso de sus armas, y habiendo sido agredido y derribado al suelo mientras se le tenía agarrado por los brazos y apuñaleado acto seguido, infiriéndosele las heridas cau-

santes de su muerte, el hecho, visto desde el ángulo más favorable a la defensa, constituiría siempre un asesinato.

■ Se insiste en que el veredicto es contrario a ley porque el jurado no podía, dentro de sus atribuciones, declarar culpables a dos de los acusados de asesinato y a otro de ellos de homicidio. Podía, de acuerdo con la jurisprudencia.

El fiscal en su alegato hace la siguiente cita de la Enciclopedia de Ley Criminal, pág. 460, de Brill:

"Bajo la ley común un accesorio no puede ser declarado culpable de ningún grado mayor del delito que aquél del cual se haya declarado culpable también a su principal. Y generalmente la culpabilidad del principal en segundo grado o de uno que ha estado presente durante la comisión del delito ayudando o aconsejando, es medida por la intención de aquél que ha realmente perpetrado el delito. Si el accesorio o cómplice interviene en la comisión del delito con la misma intención y propósito, entonces su culpabilidad será del mismo grado que la del principal actor. Pero, sin embargo, hoy día generalmente se ha establecido que los principales, accesorios y los que ayudan o aconsejan a la comisión del delito, pueden ser declarados culpables de diferentes grados del delito, de acuerdo con sus respectivas intenciones en la participación del delito. Esto ha sido muy frecuentemente establecido en casos de homicidio, por ejemplo. Así, se ha resuelto que un accesorio o principal en segundo grado o uno que ha ayudado o ha aconsejado en la comisión de un homicidio, puede ser declarado culpable de asesinato en un grado más alto o más bajo que el verdadero perpetrador del crimen, o puede ser convicto de asesinato aún cuando el verdadero perpetrador de la muerte haya sido convicto solamente de homicidio o puede ser convicto de homicidio aún cuando el perpetrador de la muerte haya sido convicto de asesinato. La misma regla prevalece y ha sido aplicada en procesos por ataque para cometer homicidio o para cometer asesinato o en ataques para cometer violación."

En el caso de *Leslie* v. *State,* resuelto por la Corte Criminal de Apelaciones de Texas, 42 Tex. Cr. 65, 57 S. W. 659, se resolvió que:

"Si un principal en segundo grado, o alguien que ha ayudado en el crimen lo ha hecho con una intención distinta que el verdadero

perpetrador del crimen, él será culpable de acuerdo con la intención con la cual él ha llevado a cabo su participación en el crimen.''

Y en el de *Miller* v. *State*, de la Corte Suprema de Wisconsin, reportado en 139 Wis. 57, 119 N. W. 850, se decidió que:

''Cuando dos personas se combinan para atacar a otra y una de ellas intenta materla y la otra no tiene intención de matarla, y la persona resulta muerta por la primera, los acusados pueden ser convictos de diferentes grados de homicidio.''

El veredicto no es, pues, contrario a la prueba ni a la ley, y como tampoco cometió la corte el último de los errores señalados, ō sea el veinte y dos, que se refiere a su negativa a conceder un nuevo juicio, *el recurso interpuesto debe ser declarado sin lugar y confirmadas la resolución y la sentencia recurridas.*