EL PUEBLO DE PUERTO RICO, demandante y apelado *v.* PERFECTO QUILES, acusado y apelante.

No. 4083.—*Sometido:* Mayo 7, 1930. *Resuelto:* Marzo 11, 1931.

916

R. *Cuevas Zequeira* y *F. Rodríguez Alverio*, abogados del apelante;
R. A. *Gómez*, abogado de *El Pueblo*, apelado.

EL JUEZ ASOCIADO SEÑOR WOLF, emitió la opinión del tribunal.

En este caso, el fiscal de este tribunal sugirió la revocación fundándose, quizá entre otros motivos, en que la corte, a la cual se le sometió el caso sin la intervención de jurado, cometió manifiesto error rechazando la prueba tendente a demostrar la defensa propia presentada por el acusado, y al dar crédito a la sola declaración del lesionado. El delito imputado es el de atentado a la vida, y el letrado que argumentó oralmente el caso ante esta corte no fué el mismo que en la corte inferior. El fiscal de este tribunal hace un resumen de la prueba del Gobierno, más o menos en la siguiente forma: Que Antonio Flores, el hombre contra quien Quiles (el acusado) disparó, se hallaba en la tienda de Eusebio Miranda en compañía de Juan Maldonado, Francisco Ruiz, Federico Luna y Etanislao Rodríguez, además del dueño, Euse-

bio Miranda; que Víctor Cabrera, mayordomo de Quiles, llegó al establecimiento de Miranda para pedir a Flores que fuese a casa de Quiles para que le llevara una carta; que Cabrera y Flores salieron del establecimiento de Miranda, mientras que los otros permanecieron allí; que la casa de Quiles quedaba como a media cuerda de distancia; que las personas que permanecieron en la tienda oyeron dos o tres disparos, fueron a casa de Quiles y hallaron a Flores en el suelo con heridas en los muslos. El fiscal expuso otros extremos que es innecesario relatar, y entonces expresó que la prueba tendió a demostrar que Flores estaba algo picado, es decir, metido en licor; que de acuerdo con la declaración del médico, Flores recibió dos heridas en los muslos, de carácter leve, que curaron rápidamente. Con el testimonio del Jefe Soldevila se demostró que cuando Perfecto Quiles se entregó dijo que venía a hacerlo porque había hecho ciertos disparos contra un tal Flores, y que cuando el jefe le preguntó a Quiles si había matado a Flores, el acusado le contestó que no sabía; que Quiles no supo decir dónde estaba la pistola con que había disparado; que el perjudicado Flores declaró en el sentido de que en la tarde del Viernes Santo, 29 de marzo de 1929, se hallaba en la tienda de Eusebio Miranda con las personas arriba mencionadas; que Víctor Cabrera vino a buscarlo para que fuera a casa de Quiles; que él salió con Cabrera para la casa del acusado, y a su llegada allí el acusado Perfecto Quiles, quien tenía una pistola, sin que mediaran palabras o sin que hubiera discusión entre ellos y sin decir nada, se le vino encima (a Flores), haciéndole tres disparos, ocasionándole una herida en el muslo de cada pierna, que se cayó al suelo y de allí fué levantado por Francisco Ruiz y otros amigos y llevado a la tienda de Miranda y luego al hospital. Tal es más o menos la síntesis de la prueba de El Pueblo hecha por el fiscal. Debemos agregar, sin embargo, los siguientes hechos que no fueron controvertidos: que el médico declaró no sólo que las heridas fueron recibidas en

los muslos, sino en la parte superior de los mismos; que Quiles, sin investigación alguna respecto al estado del caído, montó en su caballo y se fué. Además, considerando la naturaleza desinteresada de los testigos, fué un hecho establecido que Flores fué al establecimiento o casa de Quiles a instancias de éste. La prueba de descargo, consistente en la declaración de Víctor Cabrera, Ramón Nazario, y el propio acusado, resumida por el fiscal, tendió a demostrar que la tarde del día referido el acusado Quiles volteaba su finca atendiendo a sus quehaceres y portando una pistola; que al regresar a su casa, más o menos como a las tres de la tarde, halló que su empleado Pablo Cabrera, hijo de Víctor Cabrera, no estaba en la casa, y que, deseándolo para un trabajo, envió a Víctor Cabrera para que lo buscara en la tienda de Eusebio Miranda; que Víctor Cabrera, para cumplir con ese encargo, fué al establecimiento de Miranda y le dió el recado a Pablo Cabrera; que al salir para la casa de Quiles, Antonio Flores le dijo: "Don Víctor, voy a ir con usted", y que los tres salieron para la casa de Quiles; que antes de llegar a la casa de Quiles, Flores le dijo a Víctor Cabrera: "vengo acá con usted, porque yo me hallo ser machito, y soy un hombre completo"; que al llegar allí, y al encontrarse con Quiles, Flores pronunció ciertas palabras que no es necesario transcribir, pero no es posible usar palabras más insultantes en el idioma castellano; que Quiles le dijo que se detuviera, y no se le acercara; que entonces Flores haló por una navaja de cabo negro que tenía en el bolsillo de atrás, y vino hacia adelante, aunque Quiles le decía que se detuviera y no se le acercara, pero que, no obstante, volvió contra él y lo atacó; que Quiles retrocedió y tropezó con la pared de la tienda, y que, como no pudo seguir retrocediendo, entonces disparó; que Flores estaba ebrio; que en la mañana de ese mismo día Flores había estado en casa de Quiles, hallándose presentes algunos de los testigos, así como algunas jóvenes y la esposa de Quiles, todos jugando lotería; que Flores subió, pasó por

la sala, y dijo que iba a picar la lotería y a romperla; que cuando eso ocurría por la mañana Perfecto Quiles no estaba en su casa; que Flores había usado aquella mañana un lenguaje insultante similar al de por la tarde, y que es un individuo pervertido que desde niño le ha gustado pelear; que también declaró Don Modesto Cobián sobre la reputación del acusado, expresando que tenía al acusado por honrado, religioso, trabajador y cumplidor de sus deberes.

A este resumen debe agregarse que, a juzgar por toda la prueba, no puede haber duda de que Flores era un hombre pendenciero, y aun provocativo; que el acusado admitió que no se encontró la navaja; que declaró que sólo disparó cuando Flores estaba a una distancia como de un escritorio; que, más particularmente, y esto es muy importante, Quiles, Víctor Cabrera y Ramón Nazario negaron el hecho establecido de que Flores vino a casa de Quiles a instancias de éste. Igualmente, Quiles negó enfáticamente que él tuviera conocimiento alguno del incidente ocurrido en su çasa en la mañana de aquel día, aunque tanto Cabrera como Nazario lo sabían. De esta reseña hecha por nuestra lectura de un árido récord, es evidente que el juez de la corte de distrito, por quien fué juzgado el caso sin la intervención de un jurado, no creyó el testimonio de los testigos del acusado, y no podemos llegar a la conclusión de que se equivocó. Además, cuando se admite que la corte tuvo la oportunidad de observar a todos los testigos—que nosotros no hemos tenido—no nos sentimos en situación de dudar que la corte tuviera el derecho de no creer a dichos testigos. El apelante y el fiscal hacen algún hincapié en el hecho de que ninguno de los testigos de El Pueblo excepto el mismo Flores se hallaba presente en el momento de los disparos, mientras que todos los testigos del acusado sí lo estaban. Aunque Flores negó haber estado en casa de Quiles durante la mañana, no obstante, la corte tenía derecho a creer el resto de su declaración, y ello, a pesar de que él tenía la fama de ser pendenciero y borrachón. La negativa

de los testigos del acusado de la invitación de Flores es un hecho resultante en el caso, que casi por sí solo hubiera justificado el que la corte no creyere las declaraciones del acusado y sus testigos; de igual modo, la negativa de haber tenido conocimiento alguno de lo sucedido durante la mañana. Podemos inferir de las preguntas hechas por la corte, que ella creyó que el móvil de los disparos fué la conducta de Flores en la mañana del mismo día. El fiscal tampoco señaló el hecho de que Quiles dijo que había disparado a los pies de Flores, aunque, según demuestra la prueba, los disparos surtieron efecto en la parte superior de cada uno de los muslos de Flores, y, por tanto, muy cerca de partes vitales del organismo. Evidentemente, la corte no creyó que Quiles disparara hacia los pies de Flores. Bajo las circunstancias expuestas, la corte tenía derecho a creer de la declaración de Flores y de la demás prueba directa y circunstancial que Quiles le disparó directamente a Flores, o que, quizás, disparó tan imprudentemente que muy fácilmente pudo haberlo muerto; de igual manera, que Quiles no disparó en defensa propia, sino por sentirse molesto por la conducta de Flores. Descartando la prueba de defensa propia, la corte aparentemente llegó a la conclusión de que Quiles, de todo punto enfurecido por el comportamiento de Flores en la mañana, mandó por él y le disparó con la intención de matarlo. Tal fué probablemente la idea del juez sentenciador, pero quizá pudo tener una teoría ligeramente distinta, y a pesar de ello no nos sentiríamos en condición de revocar por el fundamento de que la sentencia es contraria a la prueba, según se alega.

El apelante cita del caso de *People* v. *Grenshaw*, 298 Ill. 412, 15 A. L. R. 671, pero lo que de la opinión se transcribe en el alegato revela que la intención deliberada de matar puede demostrarse por los hechos establecidos por la prueba. No puede haber duda en este caso de que, si existió la intención de matar, fué deliberada. Una inferencia semejante puede hacerse del caso de *State* v. *Sips*, 202 Iowa 173, 47 A.

L. R. 407, también citado por el apelante. En *People* v. *Grandi,* 33 Cal. App. 637, el acusado admitió en la silla testifical haber hecho dos disparos, en el momento del supuesto ataque, pero declaró enfáticamente que no disparó contra Tognola. La corte dijo, después de resolver los errores señalados: ''Hemos considerado ya todos los puntos por los cuales se solicita la revocación, y habiendo examinado y considerado íntegramente los autos, no hemos hallado razón legal alguna para alterar el resultado a que se llegó en la corte inferior.'' Si bien es posible que pueda hacerse una distinción de ese caso, tiende a demostrar que cuando la prueba directa y circunstancial es tal como la del presente, una corte de apelaciones no variará las conclusiones del juzgador de los hechos.

Si un hombre dispara contra otro y lo mata, la intención deliberada puede inferirse de la muerte. Artículo 247 del Código de Enjuiciamiento Criminal. Sin embargo, todas las autoridades demuestran que cuando el delito imputado es el de ataque para cometer asesinato, no se puede inferir intención alguna ni siquiera del uso de un arma mortífera, sino que El Pueblo está obligado a establecer la intención deliberada. El caso de *People* v. *Mize,* 80 Cal. 41, también citado por el apelante, en gran modo demuestra este estado de la ley. Según hemos apuntado, El Pueblo presentó un caso tal que la corte inferior tenía derecho a llegar a la conclusión, fuera de toda duda razonable, de que el acusado era culpable. Esto resuelve los señalamientos tercero y cuarto.

■ El primer señalamiento de error, al efecto de que no se le celebró al acusado un juicio rápido, merece poca consideración. Aparece que no se suscitó cuestión alguna de esta naturaleza en la corte inferior, y nada tenemos ante nosotros que pudiera servirnos para revocar por este fundamento.

■ No estamos de acuerdo con el apelante, según su segundo señalamiento de error, en que la corte se excedió en su autoridad al sugerir al fiscal de distrito, como lo hizo, que

había dejado de llamar al médico en el caso. La corte tiene amplia discreción para impedir un fracaso de la justicia, y no hallamos abuso alguno.

El acusado también radicó una moción de nuevo juicio. La corte no cometió error al sostener que la evidencia presentada por las declaraciones juradas no era suficiente para variar su apreciación de la prueba. La corte tenía un perfecto derecho, si la prueba era acumulativa o si estaba convencida de la falsedad de la misma, de negarse a conceder un nuevo juicio.

Además, la corte resolvió no sólo que la prueba no bastaba para alterar la convicción de culpabilidad, sino que el acusado no había, como cuestión de derecho, satisfecho a la corte de que las materias a que se referían las declaraciones juradas no pudieron ser descubiertas mediante la debida diligencia por parte del acusado antes del juicio. Tomemos por ejemplo la cuestión del supuesto hallazgo de la navaja. El acusado estaba obligado, al tiempo del juicio, a saber que se le preguntaría sobre la existencia de la navaja; y si en realidad se encontró, pudo haber sido localizada antes. Con mucha facilidad, y sin ninguna connivencia de parte del acusado, sino por medio de la intervención de cualquiera de sus amigos, tal navaja pudo ser descubierta.

*Debe confirmarse la sentencia apelada.*