EL PUEBLO DE PUERTO RICO, demandante y apelado *v.* RAFAEL MORALES ACOSTA, acusado y apelante.

Núm. 11205.—*Sometido:* Marzo 12, 1946. *Resuelto:* Mayo 2, 1946.

---

*Ramos Antonini & Ortiz,* abogados del apelante; *Hon. Procurador General E. Campos del Toro, Luis Negrón Fernández, Primer Procurador General Auxiliar,* y *J. Correa Suárez, Fiscal Auxiliar del Tribunal Supremo,* abogados de El Pueblo, apelado.

El Juez Asociado Señor Snyder emitió la opinión del tribunal.

El acusado fué juzgado dos veces por el delito de asesinato. En ambas ocasiones al jurado no le fué posible ponerse de acuerdo. En el tercer juicio el jurado lo declaró culpable de homicidio voluntario recomendando clemencia. La corte de distrito le impuso dos años de presidio. Contra dicha sentencia y contra la resolución declarando sin lugar la moción de nuevo juicio el acusado ha apelado.

■ Cuando empezó el juicio a las nueve de la mañana, el acusado solicitó que se suspendiera hasta las dos de la tarde, por el fundamento de que sus dos abogados estaban físicamente agotados por haber intervenido en otros casos, los cuales también habían impedido a dichos abogados conferenciar con el acusado. Toda vez que el juicio había sido suspendido varias veces por razones similares y como los abogados estaban familiarizados con la evidencia con motivo de los dos juicios anteriores, la corte de distrito denegó la moción, anunciando que concedería a los abogados un término razonable para conferenciar con el acusado. No podemos convenir con el acusado en que esta actuación constituyó abuso de discreción por parte de la corte inferior.

■■ Alega el apelante que la corte de distrito cometió error al negarse a eliminar del panel del jurado un jurado potencial quien fué seleccionado por el Comisionado de Jurados de San Juan, no obstante el hecho de que el jurado vivía en Río Piedras. La posición del acusado es que esta actuación de la corte le obligó a hacer uso de una de sus recusaciones perentorias para eliminar este jurado, y que como resultado de ello se redujo el número de recusaciones perentorias que de otro modo hubiera tenido a su disposición, en per-

juicio suyo, toda vez que posteriormente agotó sus recusaciones perentorias.

El acusado no cita caso alguno en apoyo de su contención. Sólo hemos encontrado cuatro casos—*Ex Parte Díaz, alias "Martillo"*, 7 D.P.R. 153, 177; *Pueblo* v. *Carbonell*, 34 D.P.R. 479; *Pueblo* v. *Capre*, 44 D.P.R. 112, 116–18; *Pueblo* v. *Pérez*, 47 D.P.R. 765, 769–71— que interpretan el estatuto envuelto, artículo 194 del Código de Enjuiciamiento Criminal.[1] Sin embargo, ninguno de estos casos sirve de autoridad para la proposición de que un error perjudicial para el acusado surge de la mera demostración, sin más, de que un hombre en la lista de cien sometida por uno de los Comisionados de Jurados de conformidad con el artículo 194, no era del municipio del Comisionado, si bien vivían en el mismo distrito judicial.

El caso de *Carbonell*, que es el que más se le asemeja, se puede distinguir con facilidad. En dicho caso se resolvió que era error perjudicial el desviarse de la forma provista en el artículo 194 para la insaculación del panel regular,[2] estando justificada la revocación de una sentencia condenatoria por el fundamento de que (pág. 479–80) "los comisionados, si-

---

[1] Este artículo prescribe:

"Artículo 194.—Dichos comisionados prepararán entonces una lista general definitiva de trescientos jurados para el distrito judicial, la cual firmarán y certificarán, ajustándose a lo siguiente: Cada comisionado hará una lista provisional de cien nombres de personas de su respectivo municipio, que estén capacitadas para actuar como jurados en el distrito judicial, para lo cual tomarán como base la lista de contribuyentes del expresado municipio, que le será suministrada por el Tesorero de Puerto Rico. Los comisionados entonces determinarán hasta donde sea posible, el número proporcional que de los trescientos jurados corresponda a cada municipio, tomando como base para ello, su población, según el último censo de los Estados Unidos, y el número así determinado, se extraerá a la suerte por uno de los comisionados, en presencia de los demás, de entre los cien nombres en la lista provisional del respectivo municipio."

[2] La desviación del procedimiento estatutario se describe en el caso de *Carbonell* a la pág. 479, como sigue: "En cada distrito judicial de la Isla la lista de jurados de la cual son sorteados los paneles regulares, consta de trescientos nombres. Estos trescientos nombres son elegidos por comisionados proporcionalmente de cada municipio del distrito de acuerdo con la población de dicho municipio. En el presente caso los comisionados seleccionaron exactamente el número de personas para formar la lista que correspondía a cada municipio, pero sin hacer un sorteo previo."

guiendo las instrucciones de la corte, procedieron en cuanto a sus deberes en la forma indicada . . . porque el juez de la Corte de Distrito de Mayagüez deseaba que ciertos jurados que habían rendido veredictos no satisfactorios fueran excluídos de la lista y del panel del distrito.'' Pero nada hay en el récord ante nos que demuestre que este jurado fué incluído en la lista de jurados con el deliberado propósito de infringir el artículo 194 o de que su presencia en el panel fué parte de un esfuerzo para incluir o excluir ciertos jurados. El acusado no alega que el jurado estaba impedido de actuar por algún otro motivo. Por tanto no vemos perjuicio alguno en el hecho de que el acusado viniera obligado a usar una de sus recusaciones perentorias para eliminarlo. Este error, de existir, fué inadvertido y no ocasionó daño alguno, y no le da derecho al acusado a obtener la revocación de la sentencia. Véase *People* v. *King*, 85 P.2d 928, 941 (Calif., 1938); *People* v. *Crossan*, 261 P. 530 (Calif., 1927); *People* v. *Sowell*, 78 P. 716 (Calif., 1904); 15 Cal. Jur., sección 52, pág. 382; *Annotation*, 92 A.L.R. 1109.

El apelante se queja de que Herminio Oliveras actuara como jurado y del procedimiento bajo el cual aquél fué seleccionado. Al escogerse el jurado, la corte de distrito siguió la práctica de llamar doce jurados potenciales para ser examinados por los abogados. Aquellos que no fueron recusados después de tal examen, fueron juramentados como jurados. Entonces se llamaron otros jurados potenciales y fueron sometidos al mismo procedimiento hasta que se completó el jurado. La corte de distrito no estaba obligada a seguir esta práctica. Pudo haber pospuesto la prestación del juramento hasta que se hubiera seleccionado todo el jurado. En verdad, los abogados del acusado solicitaron que se siguiera esta última práctica, pero la corte inferior se negó a ello.

El artículo 221 del Código de Enjuiciamiento Criminal dispone que la recusación ''deberá hacerse al presentarse el miembro del jurado, y antes de que se le tome juramento para

entender en la causa, pero podrá el tribunal, si para ello hubiere razón, permitir que esto se haga después del juramento y antes de que el jurado se complete.'' Hemos resuelto que bajo el artículo 221 deberá hacerse una recusación perentoria antes de que el jurado de que se trate preste juramento para entender en la causa. Después que haya prestado juramento, si el jurado no se ha completado todavía, puede aún ser recusado—pero sólo motivadamente. *Pueblo* v. *Torres,* 48 D. P. R. 39. Y con el fin de prolongar cuanto sea posible el término para las recusaciones perentorias, este Tribunal sugirió en el caso de *Torres* que era deseable posponer el juramento de los jurados hasta que todos éstos se hubieran seleccionado.

Pero nuestros estatutos no contienen disposición mandatoria alguna sobre esta cuestión. Por tanto, el asunto descansa en la discreción de la corte de distrito. Y solamente si resolviéramos que el emplear el sistema preferido por la corte de distrito constituyó abuso de su discreción, perjudicando los derechos del acusado bajo los hechos de este caso específico, estaríamos justificados en revocar la sentencia por este motivo. El acusado alega que el haber dejado la corte de posponer la prestación del juramento de los jurados hasta que el jurado se completara, seriamente perjudicó sus derechos toda vez que le impidió hacer uso de una recusación perentoria para Oliveras.

La tarde antes del juicio cuarenta jurados potenciales fueron especialmente insaculados para intervenir en este caso. Entre ellos estaba Oliveras, quien fué examinado y no fué recusado, siendo juramentado como tal jurado bajo la práctica usual de la corte de distrito. Después de haber sido seleccionados y haber prestado juramento once jurados y mientras el acusado todavía tenía una recusación perentoria, el abogado del acusado manifestó que se acababa de enterar que Oliveras era hermano de un testigo cuyo nombre aparecía en la lista de testigos del fiscal. Diciendo que tenía absoluta confianza en la integridad de Oliveras, a quien conocía hacía

algún tiempo, el abogado pidió a la corte de distrito permiso para examinarlo en cuanto a si sabía que su hermano estaba en lista para declarar y "si en algún momento ha cambiado impresiones con su hermano sobre particulares de este caso y si a pesar de enterarse de eso él ratificaría su contestación de estar en condiciones de actuar imparcialmente en este caso y si consideraría el testimonio de su hermano, si fuese presentado, como el de cualquier otro testigo y me bastaría la palabra del señor jurado."

Al oponerse a esta moción, el fiscal dijo que el hermano de Oliveras había estado en la lista de testigos durante un año; que en el *voir dire* a Oliveras se le preguntó expresamente por el abogado del acusado si sabía de algún motivo por el cual no debiera actuar de jurado en este caso, contestando Oliveras en la negativa; y que no utilizaría al hermano como testigo. La corte de distrito resolvió que, habiendo ya prestado juramento Oliveras, la moción tenía que declararse sin lugar.

No encontramos que los derechos del acusado se perjudicaran sustancialmente con lo sucedido. La lista de jurados regulares que actuarán por un año se hace por los comisionados de jurados del distrito. Artículos 194-97, Código de Enjuiciamiento Criminal, ed. 1935. Pero pueden surgir situaciones que requieran la selección de un grupo de jurados para actuar especialmente en un caso específico. Artículos 199, 202, Código de Enjuiciamiento Criminal. El acusado no alega que fuera errónea la actuación de la corte de distrito al seleccionar cuarenta jurados del panel regular para actuar especialmente en este caso. La lista conteniendo estos cuarenta nombres estaba en poder del acusado la mañana del juicio. Por tanto tuvo amplia oportunidad de preguntar a Oliveras si estaba emparentado con Rafael Oliveras y si había discutido el caso con su hermano, quien iba a ser testigo, hecho que le constaba al acusado hacía tiempo. Toda vez que Oliveras no declaró, la única información pertinente que el abogado del acusado trató de obtener de él—si ya había discutido el caso

con su hermano, y de haberlo discutido, si eso le impediría actuar imparcialmente—ya había sido suministrada al abogado cuando Oliveras anteriomente había sido preguntado si podía actuar imparcialmente y éste replicó en la afirmativa. Y el propio abogado del acusado manifestó que la palabra del jurado era suficiente para él.

El acusado sabía que bajo la práctica de la corte de distrito perdería el derecho a recusar a Oliveras perentoriamente a menos que lo hiciera antes de que éste prestara juramento. Su esfuerzo para levantar la cuestión de una recusación perentoria para Oliveras después de éste haber prestado juramento, se hizo muy tarde. Nada encontramos en las circunstancias de este caso o en la actuación de la corte inferior que menoscabara sus derechos en el ejercicio de sus recusaciones perentorias.(³)

 También alega el acusado que (1) la negativa a suspender el juicio hasta por la tarde, (2) la insaculación de un panel especial de cuarenta jurados la tarde antes del juicio, (3) el hecho de que el acusado era de Yauco y conoce pocas personas en el distrito judicial de San Juan de donde se insaculó el panel, y (4) la negativa de la corte inferior a posponer la prestación del juramento del jurado hasta que se hubiera completado el mismo, fueron circunstancias que combinadas impidieron al acusado enterarse de que uno de los jurados potenciales era un ex cuñado del fiscal y tío de dos

---

(³)La opinión disidente en este caso afirma que se debió haber permitido al demandado reexaminar a Oliveras con el fin de determinar si existían bases para recusarlo *motivadamente*. Pero el récord demuestra que el demandado no pidió reexaminar a Oliveras con ese propósito. Tanto en la corte inferior como en esta corte el demandado se queja solamente de que la práctica de la corte de distrito de tomarle juramento a cada jurado individualmente—práctica que ha sido sostenida como legal por este tribunal—le impidió recusar perentoriamente a Oliveras. El abogado del demandado no alegó en la corte de distrito, ni tampoco lo alega ahora ante este tribunal, que tenía derecho a reexaminar a Oliveras, no obstante el hecho de que ya había sido examinado y juramentado, para que pudiera, de conformidad con el artículo 221, hacer uso de una recusación motivada que puede hacerse "después del juramento y antes de que el jurado se complete". Véase *Pueblo* v. *Torres*, 48 D.P.R. 39, 50–51. Por tanto nos parece que el punto en el cual se basa la opinión disidente no está envuelto en este caso.

de sus hijos. Su argumento es que, de haber tenido conocimiento a tiempo de este parentesco, hubiera tenido la oportunidad de recusar al jurado perentoria o motivadamente. Aparte del hecho de que no conocemos razón alguna por qué la actuación en el jurado de un hermano de la ex esposa del fiscal pudiera perjudicar al acusado, no vemos base para quejarse en este caso. La información que el abogado del acusado ahora tilda de ser tan importante se hubiera podido obtener por una sencilla pregunta de si cualquiera de los jurados potenciales estaba o había estado alguna vez emparentado por consanguinidad o afinidad con el fiscal. El dejar de hacer esta pregunta no puede caracterizarse como error perjudicial de la corte de distrito.

■■ El apelante en su alegato pone gran énfasis en su próxima contención: el alegado error de la corte de distrito al declarar sin lugar la moción de nuevo juicio que se basó *inter alia* en evidencia recientemente descubierta. Para resolver esta cuestión tenemos que examinar la prueba presentada durante el juicio.

Sólo declararon dos testigos importantes por parte del Pueblo: Héctor Rivera y Justino Reyes. Rivera declaró que como amigo de Carlos Pérez acompañó a éste a una casa donde encontraron a Gladys Morales, su hermano, y su padre, quien es el acusado en este caso. El padre acusó a Pérez de haberle dado una droga a Gladys, mientras estaban en un paseo, con el resultado de que Gladys no supo lo que le pasó en dicha ocasión. Le dijo a Pérez que tenía que casarse con Gladys. Pérez le contestó que no le había hecho daño alguno a su hija, pero que si tenía que casarse con ella, se casaría. Unicamente solicitó que se le concediera hasta el día siguiente para hablarle a Gladys a solas. Pérez y el acusado continuaron hablando mientras salían hacia el balcón. Pérez se metió la mano derecha en el bolsillo del pantalón para "arreglarse la faldeta". Allí la sostuvo mientras seguía al acusado hacia el balcón. Pérez se recostó sobre el balcón con la mano en el bolsillo, cosa que acostumbraba hacer. El testigo

no estaba mirando a los dos hombres cuando oyó el disparo que mató a Pérez. Tuvo que salir en busca de la policía.

Reyes, policía insular, declaró que estaba en el Cuartel de la Policía cuando llegó Rivera. Fué inmediatamente al sitio del suceso y encontró a Pérez sangrando, pero todavía con vida. Lo registró y no le encontró arma alguna. Le encontró su mano derecha en el bolsillo y se la sacó.

El primer testigo del acusado fué Juan E. Adames, Jefe Insular de la Detective. Declaró que el acusado vino a San Juan y le entregó un revólver diciéndole que acababa de dar muerte a Pérez con él porque éste le había deshonrado su hija y que cuando le pidió que la honrara, Pérez le ofreció dinero. La defensa entonces demostró que Gladys había sido examinada por un doctor a requerimiento de su padre, certificando el galeno que había sido desflorada recientemente.

El hijo del acusado declaró que Gladys, su padre y él se dirigían en automóvil al cuartel de la policía de Río Piedras para dejar allí una citación dirigida a Pérez, expedida por el fiscal de San Juan al solicitarle el acusado una investigación, cuando Gladys convenció a su padre de que la dejara telefonear a Pérez para ver si el asunto podía arreglarse sin necesidad de procedimientos judiciales. Fueron a una casa en Río Piedras. Pérez vino a la casa respondiendo al telefonema de Gladys. Negó que hubiera sucedido algo entre él y Gladys. El acusado le dijo a Pérez que tenía que casarse con Gladys. Pérez contestó que deseaba hablarle a Gladys a solas, pero el acusado se negó a ello. Entonces Pérez le dijo al acusado que si éste no lo dejaba hablarle a su hija, entonces le hablaría al acusado y ambos salieron hacia el balcón. Después de estar en el balcón, Pérez le dijo que "eso se puede arreglar de otra manera". El acusado le preguntó "¿De qué manera se puede arreglar si no es casándose usted con Gladys?". Pérez contestó "eso se puede arreglar con dinero". Entonces su padre dijo: "Usted retira eso o le parto la cara". Pérez entonces manifestó: "No, lo que usted va

a hacer es dejarme pasar por ahí.'' Pérez se metió la mano en el bolsillo y entonces sonó el disparo.

En apoyo de su moción de nuevo juicio, el acusado radicó una declaración jurada de Antonio La Roca al efecto de que el 15 de abril de 1941 entre 6:45 y 7:15 de la noche, se encontraba caminando cerca del sitio donde ocurrió el suceso cuando oyó un disparo de revólver. Al llegar frente a una casa, a los pocos instantes después, vió salir de la misma dos hombres, uno de mayor edad que el otro. El de mayor edad llevaba como un arma en la mano. Se montaron en un automóvil que había allí estacionado. En esos momentos miró hacia la casa y vió a otro joven de escasa estatura inclinado sobre el cuerpo de otro hombre que había tendido en el suelo, que tenía su mano derecha en el bolsillo derecho del pantalón. El joven buscó en ese bolsillo, sacó un revólver negro y se lo llevó. La Roca se alejó rápidamente de aquel sitio porque tenía miedo de verse envuelto en un asunto que pudiera costarle el empleo en la agencia federal donde trabajaba. Nunca le reveló estos hechos a nadie hasta el 7 de junio de 1944 cuando le escribió una carta al acusado después de haber sido éste convicto. La carta, que sustancialmente relataba lo mismo que la declaración jurada, también fué radicada con la moción.

Hemos resuelto que procede declarar con lugar una moción de nuevo juicio solamente cuando la nueva evidencia (1) no se pudo descubrir con razonable diligencia antes del juicio, (2) no es meramente acumulativa y (3) no impugna la prueba aducida durante el juicio. Artículo 303, Código de Enjuiciamiento Criminal, ed. 1935; *Pueblo* v. *Ruiz*, 60 D.P.R. 620; *Pueblo* v. *Salas*, 60 D.P.R. 692, 696; *Pueblo* v. *Ruiz*, 58 D.P.R. 639, 643-4; *Pueblo* v. *Ramírez*, 50 D.P.R. 234, 279; *Pueblo* v. *Quiles*, 41 D.P.R. 915, 922; *Pueblo* v. *Arroyo*, 28 D.P.R. 419; *Pueblo* v. *Lebrón*, 23 D.P.R. 658, 662; *Pueblo* v. *Cintrón*, 13 D.P.R. 222; *United States* v. *Johnson*,—U.S.—, 90 L. ed. 389, escolio 4; 8 Calif. Jur., secs. 452-54, págs. 427-32; 4 Calif. *Ten Year Supp.*, pág. 851. Asumimos, sin dis-

cutirlo, que estos requisitos se establecieron a satisfacción de la corte de Distrito.(⁴)

Pero existen entre otros dos requisitos adicionales en relación con los cuales debe la corte de distrito estar satisfecha antes de que proceda a declarar con lugar una moción de nuevo juicio por el fundamento de evidencia recientemente descubierta: (1) la nueva evidencia debe ser creíble, *Pueblo* v. *Quiles,* supra, pág. 922; *Pueblo* v. *Menéndez,* 43 D.P.R. 438; *Pueblo* v. *González,* 36 D.P.R. 867; *United States* v. *Johnson,* supra; 8 Calif. Jur., sec. 459, págs. 438-9; Calif. *Ten Year Supp.,* págs. 852, 857; y (2) probablemente produciría un resultado diferente, *Pueblo* v. *Cabrera,* 59 D.P.R. 135, 142; *Pueblo* v. *Ramírez,* supra, pág. 279; *Pueblo* v. *Español,* 16 D.P.R. 213, 232-34; *Pueblo* v. *Romero,* 27 D.P.R. 955; *Pueblo* v. *Blandford,* 23 D.P.R. 625, 631-32; *United States* v. *Johnson,* supra; 8 Calif. Jur., sec. 454, pág. 430.

La corte de distrito pudo haber declarado sin lugar la moción de nuevo juicio por el fundamento de que la declaración de La Roca no era creíble. Habiendo oído toda la prueba en el caso, la corte de distrito estaba en mejor posición que este Tribunal para determinar dicha cuestión. Estaríamos justificados en intervenir con dicha resolución únicamente si la misma no tuviera base alguna en la evidencia. *United States* v. *Johnson,* supra. Pero existe evidencia sustancial que sostiene la posición de que la declaración jurada de La Roca no era creíble. Por tanto podemos resolver, sin más, que no hubo error en la resolución de la corte inferior declarando sin lugar la moción de nuevo juicio.

Pero aun asumiendo que la corte de distrito no resolvió que la declaración jurada de La Roca no fuera creíble, pudo haberse negado a ordenar un nuevo juicio en la teoría de que de cualquier modo la declaración de La Roca probable-

---

(⁴)En cuanto a la cuestión de impugnación, si bien puede establecerse un fuerte argumento en contrario, aceptamos *argüendo* la contención del acusado de que el verdadero fin de la nueva evidencia no era el de impugnar la declaración del policía.

mente no produciría un resultado diferente. Sobre este punto, arguye el acusado que el veredicto de homicidio voluntario indicó la creencia del jurado de que el acusado había dado muerte a Pérez en súbita pendencia o arrebato de cólera. Artículo 203, Código Penal, ed. 1937. Pero alega que de haber La Roca comparecido a juicio y declarado que de hecho Pérez tenía un arma en su bolsillo, el veredicto hubiera sido diferente—con toda probabilidad de absolución por el motivo de defensa propia—porque el jurado hubiera sido entonces persuadido de que Pérez, como cuestión de hecho, se había llevado la mano al bolsillo, según declaró el hijo del acusado. Su teoría es que esta declaración hubiera contrarrestado tanto el no haber el policía encontrado el arma en el bolsillo de Pérez como la sospecha que naturalmente emanaba de la declaración del hijo—de que Pérez se había llevado la mano al bolsillo—como un esfuerzo del hijo para salvar a su padre.

El argumento del apelante es especulativo. La declaración del hijo de que Pérez se llevó la mano al bolsillo indudablemente hubiera sido robustecida si se hubiera probado que Pérez estaba armado. Sin embargo, Rivera declaró enfáticamente que Pérez tenía la mano en el bolsillo como un hábito, todo el tiempo que permaneció en el balcón. Y aun la declaración del hijo del acusado fué que la muerte de Pérez ocurrió en seguida que éste le propuso al padre que esta cuestión de honor se podía arreglar con dinero, si bien añadió que al mismo tiempo Pérez se llevó la mano al bolsillo. Más aún, Adames, otro testigo de la defensa, declaró que el acusado al entregársele le había dicho que dió muerte a Pérez porque éste le ofreció dinero cuando lo requirió para que se casara con su hija. La corte de distrito, por tanto, pudo haber concluído que el hecho de estar o no Pérez armado, probablemente no afectaría el resultado, toda vez que estaba convencida en vista de toda la prueba de que el acusado dió muerte a Pérez en un arrebato de cólera o pasión debido a la

proposición de éste, más bien que en defensa propia en vista del alegado ademán de Pérez de meterse la mano en el bolsillo.

A la luz de las anteriores consideraciones y teniendo en cuenta que el artículo 303 del Código de Enjuiciamiento Criminal dispone que la corte de distrito puede, no tiene que, conceder un nuevo juicio por el fundamento de que se ha descubierto nueva evidencia, y que este Tribunal ha dicho que las mociones de nuevo juicio "son consideradas con desconfianza y disfavor",(5) no podemos decir que el no haber la corte inferior resuelto que la declaración jurada de La Roca era creíble y que esta evidencia probablemente produciría un resultado diferente, constituyó bajo todas las circunstancias un claro abuso de discreción(6) que nos obligue a revocar la resolución de la corte de distrito y a conceder un nuevo juicio.

Si bien el acusado también apeló de la sentencia condenándolo a un mes de cárcel por portar un arma prohibida en su alegato no señala error alguno en relación con esta sentencia.

*Las sentencias condenatorias y la resolución denegando un nuevo juicio serán confirmadas.*

Opinión disidente del Juez Asociado Sr. Todd, Jr., con la cual está conforme el Juez Presidente Sr. Travieso.

Creo que la corte inferior abusó de su discreción y cometió error perjudicial al acusado al no permitir se interrogara al

(5)*Pueblo* v. *Español,* 16 D.P.R. 213, 232; *Pueblo* v. *Lebrón,* 23 D.P.R. 658, 663.

(6)En 8 Calif. Jur., sec. 463, págs. 442-3, se expone la doctrina como sigue: "Una moción de nuevo juicio está dirigida a la sana discreción legal de la corte sentenciadora, y su actuación no será alterada en apelación excepto en un caso que demuestre un claro e inequívoco abuso de tal discreción. Esta regla es peculiarmente aplicable a una solicitud basada en el fundamento de evidencia recientemente descubierta, respecto del cual se otorga a la corte sentenciadora más amplia discreción, debido a la falta de simpatía con que las cortes ven tales solicitudes. Esta discreción debe ejercitarse al determinar la diligencia demostrada, la veracidad de las afirmaciones expuestas y la materialidad y probabilidad del efecto de ellas de dárseles crédito. La cuestión de si la evidencia producida en la moción es de tal naturaleza que probablemente traería un resultado diferente, es una dirigida a la discreción del juez sentenciador."

jurado Oliveras, aun cuando el hermano de éste no declarara como testigo en el juicio. No sabemos si este testigo había declarado en los dos juicios anteriores, pero es de suponerse que su hermano conocía su intervención en el caso. De haberse permitido el interrogatorio al jurado Oliveras, el acusado pudo haberse enterado con certeza cuál era la verdadera situación y, de proceder, pudo haberlo recusado motivadamente, al serle denegada la recusación perentoria. De la moción del acusado no se desprende, necesariamente, que su propósito era recusar perentoriamente al jurado Oliveras. La corte no permitió el interrogatorio bajo la teoría errónea de que no procedía porque ya se había juramentado al jurado. Precisamente debió permitirse para poder determinar si procedía la recusación motivada. *Pueblo* v. *Torres,* 48 D.P.R. 39, 51.

Aceptando que la corte inferior tenía discreción para adoptar el método que siguió para constituir el jurado, no obstante nuestra recomendación en contrario en el caso de *Pueblo* v. *Torres,* supra, considero que, con más razón debió dar al acusado todas las oportunidades razonables para interrogar al jurado Oliveras, antes de comenzar a desfilar la prueba, aun cuando ya hubiera prestado el juramento definitivo.

Principalmente por este motivo disiento pues considero que debe revocarse la sentencia y concederse un nuevo juicio.